OF THE VIRGIN ISLANDS

**FILED**
June 27, 2025 02:36 PM
ST-2021-CV-00362
**TAMARA CHARLES**
**CLERK OF THE COURT**

## IN THE SUPERIOR COURT THE VIRGIN ISLANDS

## DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| LITTORAL WOODLAND, LLC )<br><br>)    **Petitioner,** )<br>)<br>)<br>)<br>)<br>**v.** )<br>)<br>)<br>DAWN HENRY, in her official capacity )<br>As COMMISSIONER OF THE )<br>DEPARTMNET OF PLANNING AND )<br>NATURAL RESOURCES, and THE )<br>BOARD OF LAND USE APPEALS )<br>)<br>)<br>   **Respondent.** )<br>_____) | **CASE NO. ST-2021-CV-00362**<br><br>**ACTION FOR WRIT OF REVIEW** |

### 2025 VI Super 13

ALEX M. MOSKOWITZ, ESQUIRE
DUDLEY NEWMAN FEUERZEIG
St. Thomas, VI
*Counsel for Petitioner, Littoral Woodland, LLC*

ARIEL M. SMITH, ESQUIRE
VIRGIN ISLANDS DEPARTMENT OF JUSTICE
St. Thomas, VI
*Counsel for Respondent, Department of Planning and Natural Resources*

IAN STEPHEN ANTHONY CLEMENT, ESQUIRE
VIRGIN ISLANDS DEPARTMENT OF JUSTICE
St. Thomas, VI
*Counsel for Respondent, the Board of Land Use Appeals*

## MEMORANDUM OPINION AND ORDER

¶1    **THIS MATTER** is before the Court on the following:

1. Petitioner's Notice of Appeal,[1] filed August 20, 2021;

---

[1] A Petition for Writ of Review was filed with the notice of appeal. Upon the filing of the amended petition, the August 20, 2021 Petition for Writ of Review became a nullity and was rendered inoperative. *World Fresh Markets, LLC v. Henry*, 71 V.I. 1161, 1166 (V.I. 2019) ("It is well established that, ordinarily, an amended filing supersedes any prior filing." (citing *Pacific Bell Tel. Co. v. Linkline Commc'n, Inc.*, 555 U.S. 438, 456 n.4 (2009)).

2025 VI Super 13

2. Petitioner's First Amended Petition for Writ of Review, filed November 16, 2021;

3. Petitioner's Memorandum of Law in Support of its Petition for Writ of Review, filed November 16, 2021;

4. Respondent Board of Land Use Appeals'[2] Memorandum of Law in Opposition to Petitioner's First Amended Petition for Writ of Review, filed November 30, 2021;

5. Petitioner's Reply to BLUA's Opposition to its Petition for Writ of Review, filed December 14, 2021;

6. Respondent Department of Planning and Natural Resource's[3] Brief in Response to Appellant's Writ of Review, filed April 30, 2022; and

7. Petitioner's Reply to DPNR's Opposition to the Petition for Writ of Review, filed May 13, 2022.

The record of administrative proceedings was filed October 6, 2021. Oral Arguments from the Parties were heard on March 25, 2025.

## I.    PROCEDURAL BACKGROUND

¶2    On June 27, 2017, Littoral Woodlands, LLC, through its attorney-in-fact[4] (Littoral), submitted a Coastal Zone Management (CZM) " Permit Application" (Form L&WD-2) to the DPNR for the development of parcel 2A Estate Miland on St. John.[5] In addition, Littoral provided "Proof of Legal Interest" (Form L&WD-5) along with a copy of a warranty deed to prove its ownership of the property.[6] DPNR assigned the Permit Application, No. C25-14-17L.

¶3    On July 31, 2017, DPNR informed Littoral that its application was incomplete and provided Littoral 90 days to correct the deficiencies. When Littoral failed to resubmit the supplemental information that it had attempted (but failed) to deliver electronically, DPNR conducted a site inspection on February 12, 2018, and later notified Littoral that its application had been denied for various reasons, which are outlined below.

---

[2] Respondent Board of Land Use Appeals will be referred to as "BLUA" for convenience.

[3] Respondent Department of Planning and Natural Resources will be referred to as "DPNR" for convenience.

[4] *See generally Toussaint v. Stewart*, 67 V.I. 931, 949 n.14 (V.I. 2017) ("'Attorney. 1. Strictly, one who is designated to transact business for another; a legal agent. Also termed attorney-in-fact; private attorney.)'" (quoting BLACK'S LAW DICTIONARY 138 (8th Ed. 2004)).

[5] R. of Admin. Proceedings RESP 0002, Oct. 6, 2021.

[6] Id. RESP 0006-13.

2025 VI Super 13

¶4 Littoral filed a timely notice of appeal to BLUA on March 28, 2018. After several hearings, BLUA upheld DPNR's denial of the permit; and Littoral filed the instant petition for a Writ of Review on August 20, 2021.

## II. FACTUAL BACKGROUND

### A. The CZM Minor Application

¶5 On June 27, 2018, Littoral submitted a "Corporate Application" Form L&WD-7 to DPNR, which is required for all applications made by juridical persons[7] when "making a Permit Application in Tier 1." In Form L&WD-7, which was signed and notarized, Littoral was identified as the entity's name.[8]

¶6 Littoral's Parcel, 2A Estate Miland, on St. John, (the "Property" or "Parcel") is zoned W-1 and is classified as waterfront property, zoned for a residential, single-family dwelling. Littoral proposed construction of a three-story, single-family residence with a driveway and residential "services and utilities."[9] The development was expected to commence September 1, 2017, and be completed in eighteen months.[10]

¶7 Parcel 2A Estate Miland is described as a 10,454 square-foot (.24 acre) undeveloped parcel with no parking spaces and a lot width of 193.14 feet. Thereby, only 72.6% of the lot, 7,588.0 square feet, was usable space.[11] The proposed residence was to be 2,212.0 square feet.[12] The total development, including the building, parking, and all utilities, etc., would disturb 2,500.0 square feet (37.7%) of the Parcel.[13] This would leave the following setbacks from the: (1) street 25 feet 1 inch; (2) side 14 feet 2 inches; and (3) rear 20 feet 1 inch.[14] Item 10 of the "Zoning Table Requirements" (Form L&WD-3) had a space for both the height and the number of stories of the building; Littoral only filled in that the building would be three stories.[15]

¶8 The "Flood Plain Determination and Permit Application" (Form L&WD-8) indicated that the building site had a flood zone designation A5, with a "Base Flood Elevation" at the building location of five feet above mean sea level, with the first floor being 6 feet above sea level.[16] The

---

[7] *Evans-Freke v. Evans-Freke*, 75 V.I. 407, 434 n.11 (V.I. 2021) (Swan, J., concurring) (citing BLACK'S LAW DICTIONARY 1258 (8th Ed. 2004) (defining "juridical person")).
[8] R. of Admin. Proceedings RESP-0014.
[9] Id.
[10] Id. RESP 0003.
[11] Id. RESP 0004.
[12] Id.
[13] R. of Admin. Proceedings RESP-0004.
[14] Id.
[15] Id.
[16] Id. RESP-0015.

2025 VI Super 13

proposed building was to have a "package aerobic wastewater treatment system" with the top of the tank five to six inches "above base flood elevation."[17]

### B. Permit Application Deficiencies

¶9 On July 31, 2017, DPNR informed Littoral that its application was incomplete and provided ninety (90) days to correct the deficiencies.[18] DPNR identified Form L&WD-3 as deficient for failing to provide the building height on line 10 of the form.[19] DPNR further indicated that Littoral had submitted an outdated form L&WD-7. The correct form L&WD-7 required a certificate of existence and a copy of the operating agreement for Littoral, which DPNR requested Littoral submit.[20]

¶10 DPNR also identified several other deficiencies in the "Development Permit Application/Drawings," Form L&WD-2. DPNR found the following to be deficient and asked for supplementation: (1) item "No. 6.0" be supplemented to provide the schedule of erosion control and how run-off would be channeled off the Property in light of the proposed construction.[21] In particular, there was a storm water drainage pipe on the Property; and the construction was in its path;[22] (2) Item "No. 7.05" failed to provide mitigation of silt travel from the construction site to the public road and final grading;[23] (3) Item "No. 9.00" was deficient for lack of a foundation plan;[24] (4) Item "No. 10.00" required a certified parcel map, which had not been provided; [25] and (5) item "No. 11.00" asked that form L&WD-7 be corrected as requested and that Littoral provide a copy of the road and driveway permit from the Department of Public Works (DPW).[26] Nowhere in the deficiency letter does it state that the response was required to be submitted in "hard copy."[27]

¶11 Additionally, DPNR indicated in its "Application Review Sheet" that Form L&WD-3 was incomplete due to line 10 being blank; and Form L&WD-7 was incomplete because no certificate of existence had been submitted and the maps or drawings that had been submitted were incomplete.[28]

---

[17] Id.

[18] R. of Admin. Proceedings RESP-0017. DPNR was entitled to augment the statutory requirements, making the requirement of height in feet and inches an acceptable form of regulation.

[19] Id. RESP-0018.

[20] Id.

[21] Id.

[22] Id.

[23] R. of Admin. Proceedings RESP-0018.

[24] Id. RESP-0019.

[25] Id.

[26] Id.

[27] Id. RESP-0024-31.

[28] R. of Admin. Proceedings RESP-0268.

2025 VI Super 13

¶12     In handwritten notes,[29] DPNR indicated that, in addition to the July 31, 2017 letter, it contacted Littoral via phone on July 31, 2017, regarding these deficiencies. DPNR also noted that it had received an email from Littoral on August 1, 2017, stating that the deficiencies would be corrected.[30] These notes further indicated that, on August 29, 2017, DPNR received an email from Littoral stating that the supplement had been emailed; in response, DPNR informed Littoral that the email supplement had not been received.[31] Thereafter, no additional documents or information were submitted by Littoral.

## C. Final Evaluation

¶13     On January 12, 2018, DPNR conducted its initial site inspection.[32] By letter dated February 12, 2018, to Littoral's attorney-in-fact, Milne, DPNR provided its final evaluation of the application, stating, "staff has completed its review of the application, and it has been determined that the proposed development is inconsistent with the goals and policies outlined in Title 12, Chapter 21 of the Virgin Islands Code . . . ."[33]

¶14     In its Zoning Review Sheet, DPNR noted that the proposed construction was inconsistent with the Parcel's W-1 Waterfront zoning.[34] DPNR noted that: (1) the proposed construction was not feasible for the lot size; (2) the drawings that were submitted were inconsistent with the existing site; and (3) the natural line of vegetation used on the submitted drawings was not accurate.[35] DPNR concluded the application was incomplete because the site plan was inaccurate, showing the Parcel larger than it is and the application lacked a permit for the driveway from the DPW.[36]

¶15     In the "Technical Review Sheets," DPNR indicated that the proposed construction implicated "public health, safety, and general welfare" concerns because the plans were inconsistent with the shoreline—the proposed construction would obstruct the shoreline, the proposed sewage system would be "extremely close to the sea and high water table," and the site is in a flood plain.[37] With regard to sewage disposal, there was noted a high potential to contaminate Maho Bay due to the small size of the Parcel leaving little area to disperse effluent, high water table, and proximity to the ocean making it "difficult" to anchor the sewage treatment system, especially during "high wave events."[38] DPNR likewise noted that water quality may suffer if the construction occurs because it is at a major watershed with a culvert and "head wall

---

[29] The handwritten notes are on the following documents: Coastal Zone Status Report (RESP 267); Applicant Review Sheet (RESP 268-69); Technical Review Sheet (RESP 270-71) and Zone Review Sheet (RESP 272).

[30] Id. RESP-0268.

[31] Id. RESP-0268.

[32] Id. RESP-0267.

[33] R. of Admin. Proceeding RESP-0022.

[34] Id. RESP-0271.

[35] Id. RESP-0272. The survey relied upon to establish the "shoreline" as statutorily defined had been conducted in 2011, six years prior to the application submission.

[36] Id. RESP-0269.

[37] Id. RESP-0270.

[38] R. of Admin. Proceeding RESP-270.

2025 VI Super 13

assembly" that drains that water to the sea.[39] Further, DPNR noted the construction would change the "dynamics and aesthetics of the shoreline . . . ."[40] All of the foregoing combined with the small parcel size and proposed construction would make sewage disposal dangerous.[41]

### D. Appeal to BLUA

¶16    Littoral's March 28, 2018 notice of appeal to BLUA, recited the foregoing timeline and indicated that, along with its August 15, 2017 letter, it emailed revised drawings.[42] Absent from the administrative record is any evidence indicating Littoral resubmitted its supplemental information after it was notified by DPNR that it had not been received the email.

¶17    In its written brief, Littoral asserted that the date of default approval for failure to act was fifteen (15) days after the August 15, 2017 supplement.[43] Littoral also challenged the denial of the application as arbitrary for DPNR's failure to cite specific provisions of the Virgin Islands Code that were violated and its failure to provide a contrary survey indicating what setbacks are violated.[44] Factually, Littoral asserted, *inter alia*, that the Parcel is not within a ten-year flood plain and that it was not installing an "On-site Sewage Disposal System" ("OSDS") on the Property.[45]

¶18    Littoral indicated that DPNR erred on the merits in denying its permit because Littoral had "complied with all applicable setback and flood plain" requirements and the application had been approved by default.[46] Factually, Littoral contended to BLUA that "in the denial by the CZM it alleges violation of the setback requirements but does not provide a survey showing where the plan encroaches on the setback, what boundaries are allegedly encroaching and by what amount. In contrast, Littoral provided a survey from a Virgin Islands licensed surveyor, Marvin Berning & Associates, with its permit application, which established that proposed structure conformed with the W-1 setback requirements contained in 29 V.I.C. § 299."[47] With regard to the violation of 12 V.I.C. § 403, Littoral asserted that its "construction plans provide for no such construction within the shoreline" and further criticized that there is no specification of what plants and animals were identified that support DPNR's conclusion that there is periodic standing water on the Parcel.[48] To counter DPNR's conclusions, Littoral asserted that it "submitted a Wetland Delineation study

---

[39] Id.

[40] Id.

[41] Id.

[42] Id.

[43] R. of Admin. Proceeding RESP-0234.

[44] Id. RESP-0236.

[45] Id. RESP-0237.

[46] Id. RESP-0285. Littoral also presented a takings argument (Id. RESP-0286-87) that has not been fully briefed before this Court and is, thus, waived. Therefore, summary of any takings argument is omitted.

[47] Id. RESP-290. Before this Court, Littoral clarified that this survey had been emailed to DPNR in 2013 but had not been provided as part of its 2017 application.

[48] Id. Both BLUA and DPNR concede this was a typo and indicate that the plants and animals are located on a neighboring parcel indicating standing water on that parcel. Factually, this remains relevant to and supports the conclusion that Littoral's Parcel is flood prone.

2025 VI Super 13

completed by a U.S. Army Corps of Engineers certified professional with its permit application for the subject Property and that study concluded that the subject Property is neither a wetland nor within a protected area."[49]

¶19    As a further factual challenge, which relates to the installation of an OSDS, Littoral pointed out that the:

> denial letter indicates that there is a FEMA flood zone on a parcel 'across the street' from the Appellant's parcel and concludes that heavy rainfall may affect that proposed development. DPNR also claimed that the Parcel may be subject to significant storm surge since it is on the shoreline. Both conclusions are clearly erroneous as all W-1 properties are on the shoreline and subject to storm surge and whether an adjacent parcel is part of a flood plain or not are irrelevant as the parcel sought to be developed is not designated as within the flood plain. As such, the CZM improperly denied the application predicated upon an indefensible interpretation of 12 V.I.C. § 906(a)(9).[50]

Littoral further argued that there is no prohibition of OSDS's to be found in the Virgin Islands Code[51] and argued, as a matter of fact, that Littoral had not proposed an OSDS but had, instead, proposed an aerobic treatment unit (ATU), making DPNR's conclusions "both factually and legally flawed."[52]

¶20    Littoral, as a legal matter, argued that an interpretation of "feasible" construction (as statutorily defined) would prohibit "any development of any land located in a storm surge zone [would] then [mean] there can be no development of any kind in the coastal zone" which would be inconsistent with the declared purpose of the CZM Act to facilitate responsible development of the coastal lands.[53]    In conflict with DPNR's rejection of its application, "[t]o demonstrate its commitment to the CZM Act's 'goals, policies, and standards,' Littoral submitted as part of its application, comprehensive reports surveying the land and the seaward vegetation line, the setback requirements, and wastewater and sewage mitigation plans."[54]

---

[49] Id. Before this Court, it was conceded by Littoral that this study was not provided to DPNR; and Littoral objected to DPNR's reliance upon it at oral arguments because it had not been submitted to DPNR.

[50] R. of Admin. Proceeding RESP-291.

[51] While this is true, DPNR is authorized to promulgate rules and regulations and has done so to establish a prohibition of OSDS's within the 10-year flood plain. 12 V.I.R&R. § 910-1(e)(2)(b). The Court has not found any basis to conclude DPNR exceeded its authority in promulgating this regulation, and Littoral has not presented any such argument, thus waving it.

[52] Id. RESP-291. Reviewing the building plans in the application, an ATU is one of many forms of OSDS, as it is a sewage disposal system to be installed on-site.

[53] Id.

[54] R. of Admin. Proceedings RESP-300. Before this Court, Littoral clarified that the 2011 survey had been emailed to a DPNR representative in 2013 but had not been provided as part of its application materials in 2017.

2025 VI Super 13

¶21    DPNR argued that Littoral waived the mandatory fifteen-day default approval provisions of the Virgin Islands Code because it "continued engaging in the permit process."[55]  In support, DPNR cited to Littoral's August 15, 2017 attempted supplemental submission,[56] but also asserted this was never received and that the submission was not:

> in compliance with CZM's policy . . . and established course of' dealings . . . that any submission that is to be reviewed in furtherance of a permit application must be physically submitted and stamped, "Received".  The purpose of' this practice is to ensure that all submissions become a part of the official file and record.  Appellant never submitted hard copies of' the August 15. 2017 material to the Department, and so it is was not officially considered.[57]

However, DPNR cited no provision of its rules and regulations or any form with a notice that applications and supporting materials must be delivered in physical copy and stamped to be considered as part of an application.

¶22    DPNR further argued that Littoral "continued engaging, through its representative, with Paul Kalloo (Kalloo) to cure deficiencies by informally submitting additional material.  This engagement lasted until the denial letter sent in January of 2018.  Throughout its exchanges with CZM, Littoral never asserted that it believed its application was approved through operation of law and never requested that the permit be issued on those grounds."[58]  However, nothing on the record supports these assertions.

¶23    In its written response, DPNR cited to the submitted construction plans and asserted that, on January 12, 2018, Kalloo, a DPNR inspector ("CZM Environmental Planner III"),[59] inspected the Parcel and measured from the seaward line of the low tide to the existing vegetation to determine where the "shoreline," as statutorily defined, was located.[60]  These measurements indicated that the vegetation line was ten feet further inland than shown on Littoral's "plans."[61]  Additionally, the inland boundary of the Parcel is a public road; across the road is a wetland with mangroves and a natural waterway.[62]  This neighboring parcel(s), of which a map depicting the flood plain was a part of the record, has been designated a FEMA flood plain; but there is no

---

[55] R. of Admin. Proceedings RESP-0305.

[56] While the Court has entertained this argument, the Court must note that DPNR appears to be talking out of both sides of its mouth.  First, it argues that the August supplement was never received; therefore, the information in it cannot be considered.  Then, it argues that Littoral waived any statutory deadline by attempting to submit the August supplement.  It is difficult to understand how something never received induced any reliance interest on DPNR such that Littoral affirmatively waived any deadline.

[57] Id. RESP-0306.

[58] Id. RESP-0306-07.

[59] In some of the transcripts, the name is documented as Carlough.  However, the Parties all stipulated at oral arguments that the correct name is Kalloo.

[60] Id. RESP-303.

[61] Id.

[62] Id.

2025 VI Super 13

indication Littoral's Parcel is—though, there is a drainage culvert that allows the natural watershed to flow under the public road and onto Littoral's Parcel and eventually into the sea.[63] DPNR provided the following detailed bases for its denial.

¶24    First, the Parcel "is smaller than depicted on the Plan, and therefore, cannot support the building as designed when the required 20 ft. rear yard and 25 ft. front yard setbacks are applied." DPNR relied upon the provisions of section 229 of title 29 of the Virgin Islands Code, which state as follows:

> 'Every structure in a W—I district shall be set back from the front property line a minimum distance of twenty-five (25) feet.' 'Every structure in a W—I District adjoining **a residential structure or property zoned for residential purposes** shall provide a minimum rear yard of at least twenty (20) feet.'

29 V.I.C. § 229 (emphasis added).[64] DPNR's second ground for denying the permit was that the plans submitted by Littoral depicted the distance from the low tide line to the vegetation line (12 V.I.C. § 402) as 20 feet; but when confirmation measurements were taken by DPNR, the distance between the vegetation line and the low tide line at the closest point was, in fact, 30 feet. Further, the vegetation line meandered and, at other points, was even further inland (at places 50 feet) from the low tide line.[65] These measurements indicated that the buildable space on the Parcel was smaller than depicted on Littoral's plans; and the proposed construction would infringe upon the shoreline, as statutorily defined, by at least ten feet.[66] Simply, the construction proposed would not fit on the Parcel. It does not exclude the possibility of construction on the site, just not the structures as proposed.

¶25    Third, DPNR also stated that the sewage disposal system proposed was not compliant with the requirements of the Virgin Islands Code. "[I]n the first tier . . . development must be designed so that adverse impacts on marine productivity, habitat value, storm buffering capabilities and **water quality** are **minimized to the greatest feasible extent** by careful integration to construction with the site," and any construction must "maintain or increase coastal water quality through control of erosion, sedimentation, runoff, siltation and sewage discharge." 12 V.I.C. § 906(b)(9)-(10).[67] Due to the topography of the Parcel and surrounding area, DPNR concluded the Parcel was prone to flooding, as primarily indicated by a storm water drain under the public road.[68] Mangroves on the adjacent parcel further support this conclusion.[69] The flooding and proximity to the sea raise concerns that any sewage treatment system would be overwhelmed during heavy rains,

---

[63] Id.

[64] Id. RESP-308.

[65] Id. RESP-0308-09.

[66] R. of Admin. Proceeding RESP-0309.

[67] Id.

[68] Id. RESP-0309-10.

[69] Id. RESP-0310.

2025 VI Super 13

significant storms, or hurricanes due to flooding and storm surges.[70]    However, DPNR acknowledged that there is a restroom facility constructed on a neighboring parcel.[71]

¶26    Fourth, citing 12 V.I.C. § 906(a)(6), DPNR argued that the construction was not "designed to protect views to and along the sea and scenic coastal areas, to minimize the alteration of natural land forms, and to be visually compatible with the character of surrounding areas."[72] Lastly, DPNR argued that, even if the permit was issued by default, BLUA remained obligated to conduct a review of all the relevant application materials and determine if the permit met all the statutory requirements.[73] Specifically, DPNR argued that:

> the Board must make the requisite findings under section 910(a)(2), (3) and (4), as required by section 914(d) before issuing a permit.  In particular, the Board must assess whether the issuance of a . . . coastal zone permit to [the applicant] on the basis of the submitted materials 'is consistent with the basic goals, policies and standards provided in sections 903and 906 of this chapter' and whether 'the development as finally proposed incorporates to the maximum extent feasible mitigation measures to substantially lessen or eliminate any and all adverse environmental impacts of the development. 12 V.I.C. § 910(a)(2).[[74]]

BLUA's duties and scope of action are set forth as follows:

> The Board, by majority vote of its authorized members, shall either affirm or reverse the Commission's or its appropriate Committees or the Commissioner's action and shall either approve or deny an application for a coastal zone permit.  If the Board grants an application for a coastal zone permit, the Board **shall impose** such reasonable terms and conditions on such permit as it deems necessary to achieve the objectives and purposes of this chapter. The Board shall set forth in writing and in detail the reasons for its decision and findings of fact upon which its decision is based.  If the board reverses a Committee's or the Commissioner's action on a coastal zone permit, it **must make all of the findings required** by section 910, subsection (a), paragraphs (2), (3) and (4) of this chapter. A copy of the Board's action shalt be available for public inspection at the Board's offices during ordinary business hours, the Board's action shall be final after four working days following its decision.

12 V.I C. § 914 (emphasis added).[75]

---

[70] Id.

[71] R. of Admin. Proceeding RESP-0311.

[72] Id.

[73] Id.

[74] *Virgin Islands Conservation Society. Inc. v. Virgin Islands Board of land Use Appeals*, 2006 V.I. LEXIS 35, *25-26 (VI. Super. Ct. 2006).

[75] Id. RESP-0313.

2025 VI Super 13

¶27    In reply, Littoral asserted it had submitted a survey with its application and cited exhibit A to its reply; however, exhibit A was an email exchange between Littoral and DPNR in 2013.[76] Littoral then reiterated the arguments it already made, responding to any specific nuances of the opposition argument.

¶28    Further, in response to DPNR's waiver argument, Littoral pointed to an entire lack of evidence to indicate Littoral's continued engagement in curing deficiencies.[77] Addressing DPNR's concerns about sewage treatment, Littoral pointed again to the National Park restrooms on the beach, the restaurant facilities in the flood plain having sewage facilities, and the Marsh residence at the opposite end of the beach and argued selective enforcement.[78] Nowhere in the record does DPNR attempt to factually distinguish the construction and sewage on these parcels, some of which appear to be in the flood plain and on the beach.

¶29    At a hearing before BLUA, on November 9, 2020, DPNR's counsel reiterated its arguments already provided in its briefing. In support of these arguments, Kalloo, the DPNR inspector, was sworn and testified[79] that the application was stamped received on June 16.[80] The deficiency letter was sent July 31, and Littoral's attorney-in-fact physically went into the DPNR office thereafter to sign for receipt of the letter.[81] From the issuance of the deficiency letter to February 1, 2018, Littoral submitted various documents intended to cure any deficiencies.[82] Kalloo then showed the floodplain map, which had been submitted to BLUA as part of the record, to show that the Parcel is actually at the bottom of a watershed with an outlet to the ocean.[83] He also demonstrated on the survey the location of the watershed discharge point and the vegetation line.[84] He then showed photos of various measurements indicating the vegetation line is 50 feet inland.[85] Further, Kalloo explained that accounting for the continuous line of vegetation constituting the shoreline and the mandatory 25-foot setback, there is only approximately eight feet of buildable width of land.[86] Kalloo went on to show the location of the construction and septic and explain where the water table is, indicating that only two feet below the surface is sea water seeping in from the ocean.[87]

---

[76] Id. RESP-0348, RESP-0356-57.

[77] Id.

[78] Id. RESP-0353.

[79] Id.

[80] R. of Admin. Proceeding RESP-0117. While Kalloo did not state the year, the transcript makes clear that the year referred to was in 2017.

[81] Id. RESP-0118.

[82] Id. RESP-0118-19. However, the only supplemental submission in the record before the Court is the August 2017 supplement.

[83] Id. RESP-0120-21.

[84] Id. RESP-0121-22.

[85] R. of Admin. Proceeding RESP-0122. DPNR offers no explanation as to why these photos were not formally made part of the administrative record and submitted to BLUA.

[86] Id. RESP-0124.

[87] Id. RESP-0123.

¶30    In rebuttal, Littorals' counsel objected to any declaration that there is any rule or policy of DPNR that does not accept email submissions, pointing out that there is no rule or regulation to that effect.[88] Factually, counsel countered the measurements shown by DPNR as incomplete to the point of inaccuracy because they were taken at the extreme narrow end of the Parcel and not where the Property widens.[89] Counsel disputed the applicability of the 25-foot setback to the Parcel.[90] In response to questioning, Littoral's counsel further clarified Littoral's assertion that there is no front yard setback, stating that, because there are no adjacent residences, the front yard setback for W-1 zoned properties did not apply.[91]

DPNR's counsel responded first by pointing out that W-1 zoned properties all have a front yard setback regardless of whether there are adjoining residences.[92] Second, responding to Littoral's argument regarding statutory time limits, DPNR's counsel pointed out that, as provided in the rules and regulations, days are counted by working days, making September 1, 2017, premature for the expiration of Littoral's asserted default deadline.[93]

¶31    Upon further questioning, Littoral's counsel clarified that the Parcel was located at the far end of Maho Bay after the beach ends and the land becomes rocky with vegetation.[94] DPNR was then questioned on whether there are any sewage/septic options for a property in the ten-year flood plain; DPNR was unsure, noting the Parcel is "substandard size" and that, perhaps, septic could be placed "further up."[95] DPNR's inspector further testified that, due to the Parcel's location, there are issues due to both runoff from the watershed and storm surge during a hurricane or bad storm.[96] BLUA was also concerned about a survey showing the line of vegetation, which Littoral's counsel indicted had been submitted as Exhibit 2.[97] Upon follow up questioning, DPNR testified that the line of vegetation had grown back in the same location as before the 2017 hurricanes.[98] Due to

---

[88] Id. RESP-0125.

[89] Id. RESP-0127.

[90] R. of Admin. Proceeding RESP-0127-28 (Counsel points to an exhibit attached to Littoral's reply brief before BLUA as confirming this.).

[91] Id. RESP-0135.

[92] Id. While DPNR is correct that the front-yard set-back of 25 feet applies to the Parcel, it does not appear in the record that the rear-yard setback is factually applicable, as there is no evidence of whether any neighboring parcel is zoned residential.

[93] R. of Admin. Proceeding RESP-0135. Notably, the statutory provision does not qualify "days." DPNR lacks the authority to rewrite the statute by making such a qualification of "days" in its rules and regulations. Certainly, for any deadline not set by statute, the rules and regulations would apply; but the executive branch cannot countermand duly enacted statutes. *Villafane v. Bryan*, 43 V.I. 149, at *5 (V.I. Super. Ct. 2001) ("Indeed, it has long since been established that no administrative agency having authority to prescribe rules and regulations may adopt rules that are in conflict with the basic law that gives it its authority." (citing 3 Op. Atty. Gen. 61)).

[94] Id. RESP-0140.

[95] Id. RESP-151.

[96] R. of Admin. Proceedings RESP-0158-59.

[97] Id. RESP-0160. It should be noted that BLUA had not received the electronic copy of Exhibit 2. DPNR confirmed that it was received in size 11x17 and that it had been scanned and circulated. Id. RESP-0161.

[98] Id. RESP-0164.

2025 VI Super 13

concerns about not having the as-built survey available, any decision by BLUA was stayed and the hearing was continued.[99]

¶32    The hearing resumed on March 18, 2021.[100]  At the outset, DPNR disputed whether the survey of Harry Gauirloff, a licensed surveyor, was ever a part of Littoral's application.[101] Littoral's personal representative, Roland, indicated that a "vegetated topographical survey . . . was provided to CZM/DPNR."[102]  Kalloo for DPNR countered that a survey indicating topography and the vegetation line, which would define the shoreline, was never submitted as required by item 7.0(g) of the application.[103]  As no survey was provided to BLUA, the hearing was again continued.[104]  The hearing was recommenced on May 20, 2021.[105]  At this hearing, it was noted that the survey submitted to BLUA had been conducted in 2012.[106]

¶33    BLUA denied the permit on the following basis:

> One, the topographic survey submitted by the applicant was not a part of the lower record. Two, this survey is almost 10 years old and subject to major changes in the shoreline which helps to establish the setback. Three, there are issues pointed out in the denial letter regarding storm water management and sewage disposal that have to be addressed. Four, this application was never deemed complete within the statutory time called out within the code and asserted by the appellant.[[107]]

### E.  Writ of Review

¶34    Littoral timely filed a notice of appeal and petition for writ of review on August 20, 2021, and was subsequently granted leave to file an amended petition, which it did on November 16, 2021. After reciting the procedural history of when DPNR issued its deficiency letter, the final determination, and BLUA's decision, Littoral asserts its grounds for relief.[108]  Littoral reasserts its argument that the requirement that DPNR inform an applicant that its application is incomplete within fifteen days of receipt, as provided in 12 V.I.C. § 910(d)(1), is subject to the default approval provision contained in 12 V.I.C. § 910(d)(4).[109]  Therefore, by operation of these two provisions, DPNR's failure to notify Littoral within fifteen days of its submission of its application resulted in the application becoming complete after those fifteen days; and DPNR's further failure to grant or

---

[99] Id. RESP-0167-68, RESP-0231.

[100] Id. RESP-0373.

[101] R. of Admin. Proceeding RESP-0379-80.

[102] Id. RESP-0384.

[103] Id. RESP-0386.

[104] Id. RESP-0388-89.

[105] Id. RESP-0395.

[106] R. of Admin. Proceeding RESP-0399.

[107] Id. RESP-0416-17.

[108] Am. Pet. for Writ of Review p. 8., Nov. 16, 2021.

[109] Id. p. 7-8.

2025 VI Super 13

deny the permit within 60 days of the deemed completed date resulted in the permit being granted by default.[110]

¶35    Littoral also asserts that DPNR's actions indicate that the application was complete.[111] For example, DPNR sent letters to neighboring land owners and evaluated Littoral's application on the merits, which, in accordance with 12 V.I.C. § 910(d)(3), are only dispatched after an application is complete.[112] Littoral argues that the permit was either approved by default or denial was wrong on the merits.

¶36    BLUA filed its opposition to the amended petition and argued that its decision to affirm DPNR's denial was within its statutory authority, a correct interpretation of the CZM Act, supported by evidence, and not otherwise arbitrary or irrational.[113] BLUA's rationale for affirmance of DPNR's denial was that the lack of supplemental information in response to DPNR's deficiency letter and the further basis of denial provided in the denial letter were rationally supported by evidence and, in light of the statutory text, valid as a basis for affirmance by BLUA.[114]

¶37    Factually, BLUA pointed out that it had determined that DPNR had never deemed the application complete because Littoral had never addressed the issues raised in the denial letter and had not submitted the survey of the Parcel as part of its application.[115] BLUA further cited V.I.R. & R. § 910-7, which requires DPNR to consider drawings provided by an applicant, in support of the factual finding that the application was incomplete, further noting, "Despite DPNR issuing letters to the surrounding property owners around six months after it issued the Deficiency Letter, the Commissioner never notified the Petitioner that its application was complete."[116] BLUA emphasized that "[t]he Commissioner never issued a letter to Petitioner that its application was complete. The DPNR never received the Petitioner's response letter. There is no evidence that DPNR issued a subsequent letter stating that the application was either complete or incomplete. The BLUA argued that its decision to deny Petitioner's permit application because of these facts was rational."[117]

¶38    Citing the general principles of statutory interpretation, DPNR argued that "[r]eading the statute as a whole, we must evince legislative intent to require that persons seeking CZM permits first file a completed application for consideration and action."[118] DPNR "notified Littoral of the need to supplement discrepancies and that a new application which addresses each of the

---

[110] Id.
[111] Id. p. 14.
[112] Id. p. 14.
[113] Id. p. 5-7.
[114] Id. p. 8, 18.
[115] Id. p. 18.
[116] Id. p. 19.
[117] Resp't BLUA's Mem. Of Law in Opp'n to Pet'r's First Am. Pet. For Writ of Review p. 20.
[118] Resp't DPNR's Brief in Resp. to Appellant's Writ of Review p. 8 (footnote omitted), April 30, 2022.

2025 VI Super 13

discrepancies was required. DPNR instructed Littoral that the application would remain incomplete if these items were not addressed."[119] DPNR "never received a response from Littoral which address the issues raised in the deficiency letter"; and even after Littoral's attempted supplement by email, "the appeal record reflects there were still missing documents."[120] Notably, nowhere in the administrative record does it show that Littoral ever obtained the necessary driveway permit from DPW; therefore, "unaddressed questions and discrepancies which prevented the agency from deeming the application complete."[121]

¶39 DPNR notes that "[t]he appeal record established that Littoral had outstanding documents, and discrepancies in its application with the parcel through the appeals process and 12 V.I.C. § 910(a)(2)(B) requires the applicant to demonstrate compliance with sections 903, 906, and mitigation measures that lessen or eliminate adverse environmental impacts of its development. Littoral failed to do this, therefore both the agency and BLUA's decision should be upheld and viewed as proper."[122]

¶40 DPNR further argues that "Littoral's continued engagement with the agency to address its incomplete application constitutes a waiver of any statutory grant via operation of law,"[123] even though there is nothing in the administrative record to indicate that Littoral made any further substantive attempts to supplement its application beyond its email in August 2017.

¶41 Substantively addressing the merits of the application, DPNR argues that "[t]he physical location for the development ... cannot ... comply with the 20 ft. rear yard[124] and 25 ft. front yard setbacks mandated under 29 V.I.C. § 229" and that "the shoreline is at least 10 feet more inland than the petitioner stated in its application, the amount of buildable space on the parcel is smaller than the plan depicts," and that "there are areas that are about 50 feet more inland from the low tide mark," which would mean Littoral intends to build within the shoreline in violation of 12 V.I.C. § 402 and 403.[125] Indeed, with the required front-yard setback of 25 feet from the road, the construction would "impermissibly encroach onto the shoreline by at least 10 feet."[126] In light of these facts, "DPNR's denial of Littoral's application [on the merits is] not arbitrary or capricious."[127]

---

[119] Id. p.9.

[120] Id. p. 9-10; R. of Admin. Proceeding RESP-0238 (noting that DPNR notified Littoral that it never received the email supplement).

[121] Resp. DPNR's Brief in Resp. to Appellant's Writ of Review p.10.

[122] Id.

[123] Id.

[124] There is nothing in the administrative record to indicate any adjacent parcel is zoned for residential use, and the record establishes that there are no neighboring residences. As such, it is questionable that the rear-yard setback applies. However, it is the applicant's burden to establish any facts that would make any setbacks inapplicable. 12 V.I.C. § 910(a)(2)(B).

[125] Resp. DPNR's Brief in Resp. to Appellant's Writ of Review p.11.

[126] Id. p. 12.

[127] Id. p. 12.

2025 VI Super 13

¶42    Regarding sewage disposal, DPNR points out that "the subject area as flood prone. RESP 340 and 341. There is also presence of standing water and mangrove trees near the Parcel, which means the area is susceptible to storm surges and erosion. RESP 0310. Finally, a storm water drainpipe, which empties onto the Parcel, suggests that this Parcel's landscape is used to mitigate environmental concerns as runoff collects at the bottom of the mountain and crosses the Property to go to the sea. *Id.* Petitioner failed to provide detailed description on how it planned to manage sewage from its Parcel if there is a runoff, erosion, or flooding. By proposing to place its septic system just two (2) feet above the waterline—right next to the ocean—petitioner failed to establish that its development would not pollute the waters."[128]  "[A] portion of the proposed home, pointedly, the side closest to the beach and where the petitioner expects to place the septic system, is proposed to be placed only two (2) feet above the waterline, right next to the ocean. RESP 0123. The petitioner would literally have to remove ocean water to even succeed in building the septic system in that area."[129]

¶43    Regarding the residence at the opposite end of the beach (referred to as the Marsh residence) from Littoral's Parcel, that "residence is not as close to the sea and therefore does not pose as great an environmental risk as Littoral's property does, in causing effluent to flow into the sea if there is a storm or flooding that compromises the sewer system. Littoral's portion of the Parcel is much closer to the sea than the [other] property. As the ecological balance of that area will be changed upon placing the petitioner's dwelling in the area, the petitioner must bear the burden [[130]] of addressing mitigation measures that will help maintain and sufficiently replace the natural vegetation that currently preserves this area."[131]

¶44    Finally, DPNR argues that it "is also required to consider whether a project will be visually compatible with the surrounding areas. The proposed development is a three-story residence on Maho Bay. Currently, the only other structure on the shoreline is a National Park Service facility [that is] 1,600 sq. ft., [a] small pavilion and restroom erected for the benefit of public use, [as compared] to the petitioner's 2,500 sq. ft., private residential property. The petitioner's property would block the view of the shoreline unlike National Park Service's small facility. . . . This obstruction, less than 50 feet inland, violates § 906, therefore DPNR was not arbitrary or capricious when it denied the petitioners permit application on these grounds."[132]

¶45    In reply to arguments of Appellees, Littoral largely reasserted its prior argument that 12 V.I.C. § 910(d)(4) applies to 910(d)(1) creating a default "deemed completed" deadline of fifteen days after any application is submitted, even if incomplete.[133]  In support, Littoral argues that "[t]he reason for this mandate is that delayed action on permit applications impairs property rights by

[128] Id. p. 12-13.
[129] Id. p. 13.
[130] 12 V.I.C. § 910(a)(2)(B) ("The applicant shall have the burden of proof to demonstrate compliance with these requirements . . . .").
[131] Resp. DPNR's Brief in Resp. to Appellant's Writ of Review p. 13.
[132] Id. p. 14.
[133] Littoral Woodlan, LLC's Reply to BLUA's Opp'n to its Pet. for Writ of Review p. 1-4, Dec. 14, 2021.

2025 VI Super 13

hindering building, reduces economic development by delaying construction, and creates an environment of uncertainty in the real estate market for residents and businesses."[134] Littoral argues, "Section 901(d)(1) expressly states that it shall be issued 'in no event more than 15 days after receipt.' The 15th day is the deadline, and any deficiency letter issued after the 15th day violates the statutory deadline and is a nullity. ... BLUA's proposition would render the deadline language nugatory and result in a portion of Section 910(d)(1) becoming superfluous."[135]

¶46    Littoral argues that "DPNR, much like BLUA, ignores the plain language of 12 VIC § 910(d)(1) and (d)(4) that set the time when DPNR must make those substantive determinations on a permit application."[136] In addition to reiterating its statutory interpretation arguments, Littoral argues that "DPNR's argument that Littoral's permit was incomplete rings hollow and is contradicted by the very action DPNR took before issuing the denial letter" because DPNR, after notifying Littoral both that its application was incomplete and that DPNR did not receive the supplemental email, evaluated the application on the merits and denied such on the merits.[137]

¶47    Regarding DPNR's waiver argument, Littoral points out that DPNR "submits no evidence to support this position."[138]

¶48    Addressing DPNR's denial on the merits, Littoral asserts that "DPNR's untimely substantive denial was also fundamentally flawed. DPNR claims that the designs did not comply with the zoning setbacks. However, DPNR did not have a licensed surveyor ever visit the proposed building site. Instead, DPNR allegedly sent a layperson out" to take measurements.[139] Littoral, further asserts that "the vegetative line has essentially been restored to the historic seaward vegetative edge."[140]

¶49    Littoral's response to the selective enforcement arguments failed to address DPNR's argument that the other residence in the area was further inland and instead asserted that "a building permit was approved for the Marsh family residence located at Parcel 3A-6 Estate Abraham's Fancy, Permit BPJ-249-13, which . . . has the same septic system as proposed by Littoral"; that "DPNR also approved construction of pavilions, a parking lot, and public bathrooms on the beach

---

[134] Id. p. 4.
[135] Id. p. 6.
[136] Littoral Woodland, LLC's Reply to DPNR's Opp'n to Its Pet. for Writ of Review p. 2, May 13, 2022.
[137] Id. p. 4.
[138] Id. p. 5. Indeed, the only indication in the administrative record of further actions by Littoral are the notes in the application evaluation, which only indicate that Littoral followed up in late August, at which time DPNR informed it that the email with the supplemental information was not received. There is no evidence in the record to indicate DPNR ever informed Littoral that the application must be submitted in physical copy and date stamped, and there is also no evidence that Littoral ever re-submitted its supplement after being informed the email was never received.
[139] Id. p. 6. Littoral fails to cite any statute, rule, or regulation requiring DPNR to employ a licensed surveyor.
[140] Id p. 7. There is no basis in the administrative record for this statement, as no updated survey was ever submitted. 12 V.I.C. § 910(a)(2)(B).

2025 VI Super 13

by the National Park Service," without citation to a permit; and that DPNR permitted "a Tiki Bar, food truck, live music, and parking," although that construction is not on the beach.[141]

## III. ANALYSIS

¶50    Littoral's failure to raise its takings arguments in either its amended petition or its memorandum of law in support[142] constitutes a waiver of those arguments.[143] With regard to the asserted waiver of the statutory deadlines, nothing in the record reflects that Littoral took substantive action on the merits such that it waived any statutory deadline.

¶51    Littoral's argument that the default approval provision contained in paragraph 910(d)(4) applies to the fifteen-day time limit for DPNR to determine if its application was complete in paragraph 910(d)(1), an issue of law, fails because the express language of 910(d)(4) limits its application to only that paragraph and no other. Lastly, DPNR's denial on the merits properly applied the law. Admittedly, some factual conclusions were clearly erroneous, for example, the conclusion that there is evidence of periodic standing water on Littoral's Parcel when all other record evidence indicates the standing water is on a neighboring parcel. However, the erroneous factual findings do not impact the final analysis.

### A. Standards of Review

¶52    "Pursuant to Title 5, chapter 97" of the Virgin Islands Code, "any person aggrieved by the granting or denial of an application for a coastal zone permit" is entitled to petition for a writ of review so long as they have exhausted the administrative remedies provided in the CZM Act.[144] This Court, when determining a writ of review, has the "power to affirm, modify, reverse, or annul the decision or determination reviewed, and, if necessary, to award restitution to the plaintiff, or, by mandate, direct the officer, board, commission, authority, or tribunal to proceed in the matter reviewed according to its decision."[145]

---

[141] Littoral Woodland, LLC's Reply to DPNR's Opp'n to Its Pet. for Writ of Review p. 8. There is no evidence in the record that DPNR ever issued permits for any of these properties, and it was Littoral's burden to submit evidence of selective enforcement. 12 V.I.C. § 910(a)(2)(B).

[142] The Court also notes that, in its October 11, 2023 proposed findings of fact and conclusions of law, Littoral proposed no findings and conclusions relating to its takings arguments.

[143] *In re Bauxite Containing Silica Halliday Litig. Series*, Master Case No. SX-2015-CV-097, 2024 WL 1638585, at *4 n.3 (V.I. Super. Ct. March 26, 2024) (arguments raised for the first time in reply waived). Even if the Court were to entertain this argument, it fails on the merits because DPNR's denial letter, read as a whole, is limited to the information it had before it and does not declare or even imply that there is no construction that could occur on this Parcel. Further, Littoral itself argues factually that the historic line of continuous vegetation has grown back. As such, Littoral would be entitled to submit an updated survey reflecting this as part of a new application that could address the other concerns expressed by DPNR. Any takings determination would be premature considering the incomplete factual record and the asserted factual changes to the construction site and in light of BLUA's failure to consider this argument.

[144] 12 V.I.C. § 913(d).

[145] 5 V.I.C. § 1423.

2025 VI Super 13

¶53    No provision of the CZM Act or the writ of review provisions in Title 5 of the Virgin Islands Code prescribe a standard of review. Therefore, Virgin Islands Rule of Civil Procedure 91(i) governs. "[F]actual determinations are to be review for clear error," while issues of law, including legal findings and the application of law to fact, are to "be afforded plenary review."[146]

¶54    Under the clearly erroneous standard of review, "[f]indings of fact will be upheld unless they are either completely devoid of minimum evidentiary support displaying 'some hue of credibility' or bear no rational relationship to the supportive evidence."[147]

¶55    "[D]irect proof of a person's actions is not necessary to prove the affirmative, [but] the fact finder may only infer such from circumstantial evidence when reason and experience support such an inference because there is a rational connection between the facts proved and the facts inferred."[148] "[F]actors that are relevant to [evaluating] the credibility of testimony . . ., in civil legal parlance, a determination of whether the evidence had 'some hue of credibility,' [include] whether it was physically impossible for the witness to have observed that to which the witness testified; whether, considering the laws of nature, it was impossible for the events to which the witness testified to have happened; and . . . whether the testimony is of incredible dubiousness. To be 'incredibly dubious,' testimony must be inherently improbable with a complete lack of circumstantial evidence or be coerced, equivocal, and wholly uncorroborated."[149] "[A]ny conflicting evidence is of no consequence because a finding of fact that adopts one view of the evidence is not clearly erroneous even if there are multiple conclusions that could be drawn from the same evidence."[150]

¶56    Factual findings must "be rationally based on the [evidence and testimony] supported by firsthand knowledge of the factual predicates that form the basis for the" finding.[151] Findings of fact are supported by sufficient evidence if there is "a factual basis from which [the fact finder] could readily have rationally and logically . . ., in light of common sense and everyday experience" made the factual determination.[152]

---

[146] V.I.R. Civ. P. 91(i). While Virgin Islands courts had previously employed the "Substantial Evidence" standard when engaging in the writ of review process, the Virgin Islands Supreme Court has exercised its authority to make procedural rules for the Judiciary of the Virgin Islands by promulgating Virgin Islands Rule of Civil Procedure 91, which now controls this Court's decision. *Mills-Willaims v. Mapp*, 67 V.I. 574, 584-85 (V.I. 2017) (duly promulgated rules supersede prior precedent). However, when proscribed by statute, *e.g.*, 3 V.I.C. § 530a(b) (substantial evidence standard applicable to writs of review from the Public Employees Relations Board), other standards of review remain applicable.

[147] *Penn v. Mosley*, 67 V.I. 879, 892 (V.I. 2017) (citation omitted); *Victor v. Todman*, 2024 VI 18, ¶ 58 (Apr. 2, 2024) ("To the extent the [decision] is based on findings of fact, it will only be overturned if clearly erroneous, i.e., there is clear error.").

[148] *Penn*, 67 V.I. at 899 (citation omitted).

[149] *Penn*, 67 V.I. at 893-94 (citations omitted).

[150] *Cornelius*, 67 V.I. at 818 (V.I. 2017) (citations omitted).

[151] *See Rouse v. People*, 78 V.I. 717, 745 (V.I. 2024) (alterations and citations omitted).

[152] *Rouse*, 78 V.I. at 751 (V.I. 2024).

2025 VI Super 13

### B. Waiver[153]

¶57    Littoral argues that, after fifteen days from its June 27, 2017 application, the default provision of 12 V.I.C. § 910(d)(4) applied making its CZM minor permit application complete by default. DPNR and BLUA both argue that this supplemental submission constituted a waiver of any default approval provision. DPNR further argues that the Rules and Regulations stating it is business days, not calendar days, that apply, thus extending the deadline.

¶58    Initially, while executive agency regulations may clarify and refine statutory provisions, they cannot be counter to them. The Legislature stated "days" and not "calendar days."[154] If the Legislature wished for the counting to be calendar days, it would have specified. While rules and regulations adopted by DPNR apply to deadlines not specified in a statute, DPNR is bound by the lawful acts of the legislative branch, as is this Court. To allow rules and regulations to effectively amend a statute would be judicial legislation, something this Court cannot do. Therefore, fifteen days from the June 27, 2017 submission was July 12, 2017.

¶59    Turning to the argument of whether the record supports a conclusion of active participation by Littoral that would amount to a knowing and conscious waiver of the default approval provision, it does not. Nothing in the record supports this. The record contains only a written notation by DPNR that, after August 15, 2017, DPNR notified Littoral that it had not received any supplemental information and that Littoral responded that it had submitted such information on August 15, 2017.

¶60    Littoral's attempted supplemental response on August 15, 2017, is an action constituting waiver, as it was affirmative action providing substantive information in response to DPNR's deficiency letter.[155] If Littoral believed its initial application was sufficient, such supplemental

---

[153] Before BLUA, Littoral argued that DPNR's application of the CZM Act to its Parcel constituted a regulatory taking. BLUA's rules and regulations make clear that it has the authority to consider whether DPNR's actions have violated the Revised Organic Act, V.I.R. & Regs. tit. 12, § 914-3(a); and the ROA makes the Takings Clause of the U.S. Constitution as well as the 14th Amendment applicable to the Territory. As such, BLUA had not just the authority but obligation to both make findings of fact and determine whether DPNR's application of the CZM Act amounted to a regulatory taking. An executive agency, like a Court, is not free to disregard its own rules and regulations. *See Henry v. Dennery*, S. Ct. Civ. No. 2012–0130, 2013 WL 206128, at *2-3 (Jan. 11, 2013) (unpublished) (error to disregard own rules). However, Littoral has abandoned this argument before this Court, as it has failed to assert in even the most perfunctory manner its takings argument in either its notice of appeal, the original petition, or the first amended petition and memorandum of law in support. A party must "fairly present" any arguments it believes support their position and desired judgment, or that argument is deemed waived. *Ubiles v. People*, 66 V.I. 572, 583-84 (V.I. 2017)) (explaining fairly presented standard and the consequences of failing to Fairly Present an argument).

[154] 12 V.I.C § 910(d)(10); *Villafane*, 43 V.I. at *5 ("Indeed, it has long since been established that no administrative agency having authority to prescribe rules and regulations may adopt rules that are in conflict with the basic law that gives it its authority." (citing 3 Op. Atty. Gen. 61)).

[155] *See generally World Fresh Markets, LLC v. Henry*, 71 V.I. 1161, 1171-73 (V.I. 2019) (arguments not timely raised are waived); *Skepple v. Bank of N.S.*, 69 V.I. 700, 744-46 (V.I. 2018) (substantively participating without presenting objection waives legal arguments); *Evans-Freke*, 75 V.I. at 465-80 (Swan, J., concurring) (substantive participation can waive even a previously preserved defense).

2025 VI Super 13

information would not have been provided. However, after August 15, 2017, simply responding that the deficiencies had been corrected and inquiring when the permit will be issued are not actions substantively supplementing its application and could not amount to a waiver. Littoral has presented an argument that DPNR's failure to act within fifteen days of its August 15, 2017 supplement resulted in its application being deemed complete by default. Therefore, this Court must address the statutory construction arguments presented.

> **C. Because the Plain Text of the CZM Laws Dictate that the Default Approval Language in Paragraph of 910(d)(4) of Title 12 of the Virgin Islands Code is Limited in Application to the Deadlines set Forth in 910(d)(4), this Statutory Language does Not Create a Default, or "Deemed Completed," Completion Date of a CZM Permit Application.**

¶61    Littoral argues that the admonition in 910(d)(4) of title 12 of the Virgin Islands Code that the failure to act within the time specified in "this paragraph" constitutes a default or "deemed completed" provision the result of which would be to make any application complete, regardless of content, if no notice informing an applicant that its application is incomplete is provided within the statutory time limit. However, "this paragraph" refers only to 910(d)(4)—not other paragraphs in subsection (d) of section 910 and, therefore, does not apply to the fifteen-day limit in paragraph 910(d)(1). Under the plain language of the statute, Littoral's application was never deemed completed by default, especially given DPNR's notice to Littoral that it never received the August 15, 2017 email attempting to deliver supplemental information.

### 1. Principals of Statutory Construction

¶62    When "the Legislature has not defined [the words of a statute,] the task of determining the Legislature's intended definition of these words falls to th[e] Court."[156] Importantly, "the failure to define a term does not *ipso facto* mean a statute is ambiguous. Therefore, before venturing into considerations of legislative history and comments of legislators in the debates before the adoption of a given piece of legislation, determination of the plain meaning of any statute begins with, indeed, requires a thorough consideration of, first, the statutory language, *i.e.*, a consideration of the definitions of the words used."[157]

¶63    "'The intention of [the] law is to govern and is to be discovered by reading the whole law . . . .'"[158] Indeed, "the entire process of statutory interpretation is controlled by the presumption that the ordinary meaning of the chosen words manifests the legislative intent. Therefore, all endeavors of statutory interpretation begin with a thorough consideration of the statutory language, the statutory design, and the object of and policy underlying the statute, controlled by a

---

[156] *Greer v. People*, 74 V.I. 556, 579 (V.I. 2021).

[157] *Willis v. People*, 71 V.I. 789, 827-28 (V.I. 2019) (Swan, J., concurring).

[158] *Greer*, 74 V.I. at 579-80 (quoting *Wynehamer v. People*, 13 N.Y. 378, 479 (N.Y. Ct. App. 1856) (Mitchell, J., dissenting)).

2025 VI Super 13

presumption that the ordinary meaning of the chosen words manifests the legislative intent."[159] The "plain language," that is to say "the intended meaning of words and phrases . . . is gleaned from . . . linguistic indicators such as subject matter, context, structure, and placement . . . ."[160] The Court is "to read the words of [a statute] in 'their context and must construe them according to the common and approved usage of the English language. Technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to their peculiar and appropriate meaning.'"[161] "If such application of the relevant definitions of the actual statutory language leaves the need for further clarification, history of amendments, the statutory design, the object of and policy underlying the statute, and other matters of legislative history are to be considered."[162]

¶64    "[C]ourts must assume that the legislature intends for the entirety of the statutory language, as well as the whole statutory scheme, to be effective, unless to do so would lead to unjust or absurd results or would otherwise undermine the legislative intent."[163] "While 'regard for the purposes of the statute should infuse the construction of the legislation if it is to be treated as a working instrument of government and not merely as a collection of English words,' laws must be read, understood, and applied in light of the practical affairs of people in society as it exists and in such a manner as to effectuate the purpose of the statute, not undermine it. The rules and canons of statutory interpretation and construction have the overarching objective that 'all laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or absurd consequences. It will always, therefore, be presumed that the legislature intended exceptions to its language, which would avoid results of this character. The reason of the law in such cases should prevail over its letter.'"[164]

¶65    "Although such a statement is a gross oversimplification, it is commonly said to be 'black-letter law' that, if the plain language of the statute discloses the legislative intent, the interpretive inquiry is at an end. While this rule of statutory construction is an easy starting point, one should be mindful that, though a literal interpretation of statutory language is preferred, 'the intention prevails over the letter' requiring that a literal reading of any statute be avoided if such a reading would be contrary to its objective, *i.e.*, legislative intent. Essentially, the language of a statute must be considered as the conclusive statement of legislative intent, unless the legislature has unequivocally shown its intent to be the contrary. Certainly, 'the surest way to misinterpret a

[159] *Willis*, 71 V.I. at 824-25 (citing *Crandon v. United States*, 494 U.S. 151, 158 (1990); *United States v. Lanier*, 520 U.S. 259, 265 n.5 (1997)).

[160] *Willis*, 71 V.I. at 828-29 (quoting *Dupigny v. Tyson*, 66 V.I. 434, 440 (V.I. 2017); citing *Miller v. Sorenson*, 67 V.I. 861, 871 (V.I. 2017)).

[161] *Greer*, 74 V.I. at 580 (quoting 1 V.I.C. § 42; citing *Ubiles*, 66 V.I. at 590).

[162] *Willis*, 71 V.I. at 829 (citing *Crandon*, 494 U.S. at 158; *Heyliger v. People*, 66 V.I. 340, 354-56 (V.I. 2017)).

[163] *Willis*, 71 V.I. at 825 (citing *Cornelius v. Bank of N.S.*, 67 V.I. 806, 822 (V.I. 2017); *Dupigny*, 66 V.I. at 440; *In re Visteon Corp.*, 612 F.3d 210, 226 (3d Cir. 2010)).

[164] *Willis*, 71 V.I. at 825 (quoting *United States v. Dotterweich*, 320 U.S. 277, 280 (1943); *Gov't of the V.I. v. Berry*, 604 F.2d 221, 225 (3d Cir. 1979); citing *Commonwealth v. Regan*, 64 N.E. 407, 407 (Mass. 1902)).

2025 VI Super 13

statute is to follow its literal language without reference to its purpose.'"[165]

¶66    "Regarding the [practical] operational mechanics of interpretation, if statutes are interrelated . . . they must be read in reference to each other, *i.e.*, *in pari materia*. Interpretations that are unjust or lead to absurd results must be avoided because they are inconsistent with legislative intent.    An interpretation that renders a statute (or any part or language thereof) inoperative, nonsensical, or superfluous, or that defies rationality is absurd."[166]    In determining what definition was intended when engaging in statutory construction, the Court is to apply the "Dictionary Definition Rule."[167]

> [T]he 'Dictionary Definition Rule' . . . requires the courts of the Virgin Islands, when engaging in statutory interpretation, to first, apply any statutory definitions provided by the Legislature that are specifically applicable to the section, chapter, title, etc. under consideration; second, apply the general definitions provided in section 41 of title 1; third, apply an accumulated legal meaning as articulated in binding precedent; fourth, apply the relevant definition provided in a law dictionary or relevant persuasive authority; fifth, apply relevant technical definitions such as when professional jargon is used; and sixth, apply the common meaning as provided in a dictionary.[[168]]

---

[165] *Willis*, 71 V.I. at 825-26 (quoting *United States v. Wells*, 519 U.S. 482, 491, 498-99 (1997); *Viacom Int'l, Inc. v. FCC*, 672 F.2d 1034, 1040 (2d Cir. 1982); citing *Gilbert v. People*, 52 V.I. 350, 356 (V.I. 2009); *Lopez v. People*, 60 V.I. 534, 537 (V.I. 2014)).

[166] *Willis*, 71 V.I. at 826-27 (citing *Dupigny*, 66 V.I. at 440; *Gilbert*, 52 V.I. at 356; *Phillip v. People*, 58 V.I. 569, 590 (V.I. 2013)).

[167] *Greer*, 74 V.I. at 580 n.22 (citing *Ubiles*, 66 V.I. at 590; *Wallace*, 71 V.I. at 763 (Swan, J., concurring)).    The Dictionary Definition Rule is an amalgamation of various canons of statutory interpretation and the mandates of 1 V.I.C. § 42.   For example, items 1 and 2 of this rule, which require the application of specifically applicable statutory definitions before the general statutory definitions in title 1 of the Virgin Islands Code, reflect the canon of construction that specific provisions control over general, *see Velazquez v. People*, 65 V.I. 318-18 (2016); *e.g.*, *Richards v. PERB*, 2024 VI 37, ¶ 22 n.14 ("'Department head,' as used in chapter 25 of title 3 of the Virgin Islands Code—which includes § 530(a)—means 'the Commissioner at the head of any executive department of the Government.'" (alterations omitted) (quoting 3 V.I.C. § 451)), and the canon that courts are not free to disregard statutory provisions and must give effect to all such provisions and language (unless doing so would lead to absurd results), *Dupigny*, 66 V.I. at 440 ("All the statutory language must be given effect when doing so does not undermine the legislative intent." (citing *Gilbert*, 52 V.I. at 356; *see also In re Visteon Corp.*, 612 F.3d at 226)).   Whereas, items 3 and 4 of this rule come directly from section 42 of Title 1 of the Virgin Islands Code, which mandates that "such [words] as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to their peculiar and appropriate meaning," 1 V.I.C. § 42, and the requirement that lower courts apply binding precedent of higher courts.   Lastly, items 5 and 6 come directly from section 42 of title 1 of the Virgin Islands Code which direct that "[t]echnical words and . . . shall be construed and understood according to their peculiar and appropriate meaning," 1 V.I.C. § 42, and that other statutory language not otherwise defined must be defined "according to the common and approved usage of the English language." 1 V.I.C. § 42; *Wallace*, 71 V.I. at 763 (Swan, J., concurring) ("Words and phrases defined by statute must be applied when determining the plain meaning of a statute, and in the instance of the Legislature's failure to provide a definition by statute, any commonly understood, specific legal or technical meaning must be utilized, failing which the words of the statute are given their commonly understood 'Dictionary Meaning.'" (citing *United States v. Wells*, 519 U.S. 482, 491 (1997); *Ubiles*, 66 V.I. at 594; *Mahabir v. Heirs of George*, 63 V.I. 651, 660 (V.I. 2015); *Cascen v. People*, 60 V.I. 392, 403 (V.I. 2014))).

[168] *Greer*, 74 V.I. at 580 n.22 (citing *Ubiles*, 66 V.I. at 590; *Wallace*, 71 V.I. at 763 (Swan, J., concurring)).

2025 VI Super 13

2. **Reading section 910 *in pari materia* with section 914 of Title 12 provides the plain meaning of 910(d)(4), and the default approval provision is only applicable to the deadlines contained in (d)(4).**

¶67    Applying the foregoing principles, it is clear that—when reading the CZM Act *in pari materia*—the plain language of paragraph (4) of subsection (d) of section 910 of Title 12 of the Virgin Islands Code is limited in application to paragraph (d)(4) and does not extend to the fifteen-day time limit in paragraph (d)(1).

¶68    Subsection (d) provides, in relevant part, as follows:

(d) Coastal zone permit procedures.

(1) Upon submission of any application for a coastal zone permit, which application shall specify the type of permit being sought, the Commissioner shall determine whether such application is complete. If the Commissioner determines that such application is not complete, he shall promptly notify, in no event more than 15 days after receipt thereof, the applicant of the deficiencies in such application.

. . . .

(4) The appropriate Committee of the Commission shall act upon a major coastal zone permit application within thirty days after the conclusion of the public hearing required by paragraph (2) of this subsection, and the Commissioner shall act upon a minor coastal zone permit application within sixty days after receipt thereof. Failure of the appropriate Committee of the Commission or the Commissioner to act **within any time limit specified in this paragraph** shall constitute an action taken and shall be deemed an approval of any such application. A copy of the decision of the appropriate Committee of the Commission or the Commissioner, whichever is applicable, on an application for a coastal zone permit shall be transmitted in writing to the applicant and to any person who requests a copy thereof.[169]

This Court's decision boils down to a determination of what exactly the Legislature meant when it wrote "this paragraph." Fortunately, the Legislature provided this answer.

¶69    In subsection (d) of section 914 of title 12 of the Virgin Islands Code, the Legislature stated the following:

(d) Actions of the Board. The Board, by majority vote of its authorized members, shall either affirm or reverse the Commission's or its appropriate Committee's or the Commissioner's action and shall either approve or deny an application for a coastal zone

---

[169] 12 V.I.C. § 910(d)(1), (4) (emphasis added).

2025 VI Super 13

permit. If the Board grants an application for a coastal zone permit, the Board shall impose such reasonable terms and conditions on such permit as it deems necessary to achieve the objectives and purposes of this chapter. The Board shall set forth in writing and in detail the reasons for its decision and findings of fact upon which its decision is based. If the Board reverses a Committee's or the Commissioner's action on a coastal zone permit, it must make all of the findings required by **section 910, subsection (a), paragraphs (2), (3) and (4)** of this chapter. A copy of the Board's action shall be available for public inspection at the Board's offices during ordinary business hours. The Board's action shall be final after four working days following its decision.[170]

Reading sections 910 and 914 of title 12 *in pari materia*, it is clear that 910(d)(4) is "this paragraph." Indeed, section 914 plainly states that section 910 contains multiple subsections, one of which is subsection (d), which itself contains multiple "paragraphs," one of which is 910(d)(4). By the plain text of paragraph (4) of subsection (d) of section 910 of title 12 of the Virgin Islands Code, "Failure of the appropriate Committee of the Commission or the Commissioner to act **within any time limit specified in this paragraph** shall constitute an action taken and shall be deemed an approval of any such application." The only deadline contained in "this paragraph"—that is paragraph 910(d)(4)—is the 60 days for DPNR to act to approve a completed application.[171] While they fail to cite any principals of statutory construction and fail to analyze the plain statutory language in any meaningful way, Respondents are correct as a matter of law that the deemed approved mandate in 910(d)(4) of title 12 of the Virgin Islands Code does not apply to any other provision in sub-section 910(d).[172]

¶70    Littoral relies upon two cases in support of its interpretation of Section 910(d)(1), but both cases are distinguishable in material aspects and do not guide the Court's present decision.

¶71    In *Virgin Islands Conservation Society, Inc. v. Virgin Islands BLUA*,[173] the CZM application was complete. As such, the issue of applying the default provision contained in paragraph 910(d)(4) of title 12 of the Virgin Islands Code to the fifteen-day review deadline contained in 910(d)(1) was never an issue before the court that presided over that case; and that case is factually

---

[170] 12 V.I.C. § 914(d) (emphasis added).

[171] 12 V.I.C. § 910(d)(4).

[172] This interpretation makes sense from a regulatory standpoint. The Legislature sought to balance conflicting objectives in the CZM Act, preservation of coastal lands and waters and promotion of development. The fifteen-day review provision in paragraph 910(d)(1) serves as a prohibition upon DPNR from using its regulatory authority to create longer review periods by promulgating rules and regulations with longer deadlines. This statutory limit would enable an applicant to seek a writ of mandamus ordering DPNR to review the application and issue a deficiency letter if an application were to linger. However, by limiting the default approval provision in paragraph 910(d)(4), only complete applications would become granted by default. One its face, this statutory scheme appears to be an intentional effort by the Legislature to balance two opposing goals; and the Legislature could readily have made the policy choice to deal with any failure to meet the fifteen-day deadline through legislative oversight, as opposed to creating a statutory "deemed completed" deadline.

[173] CIVIL NO. 83/2005, 2006 WL 8089324, at *1 (V.I. Super. Ct. May 25, 2006) (St. Croix Division) ("[O]n November 18, 2003, [the Commissioner of DPNR] deemed [the CZM] application complete . . . .").

2025 VI Super 13

not applicable. Therefore, the result in that case is distinguishable from this case because Littoral's email attempting to provide supplemental information was never received and Littoral's driveway permit was never submitted—its application remained incomplete.

¶72    *Cowgirl Bebop, LLLP v. Oriol*[174] also appears to have been based upon a complete application. However, even assuming the application was not complete, a decision of a single Superior Court judge is not binding on the other judges of this Court.[175] While any decision of another judge of this Court is entitled to great respect, *Cowgirl Bebop* never considered the plain language of section 914 of title 12 of the Virgin Islands Code, which explains which sub-parts of section 910 are "paragraphs," as opposed to "subsections." As section 914 is unambiguous in defining what a "paragraph" is under section 910, this Court, considering separation of powers, must abide by what the Legislature has lawfully enacted.

¶73    Having considered and found that the default approval provision in 12 V.I.C. § 910(d)(4) does not apply to the fifteen-day mandate of 12 V.I.C. § 910(d)(1), the Court must now consider whether the denial of the CZM minor permit was supported by the factual record and applicable law.

### D. The Conclusion that Littoral's Application was Either Incomplete or Otherwise did Not Comply With Virgin Islands Law was Rationally and Logically Supported by the Evidence in the Administrative Record.

¶74    DPNR's file notes that, in late August of 2017, Littoral was informed that DPNR never received its August 15, 2017 email. In the absence of receipt of such email and the supplemental information provided therein and considering the absence of any driveway permit issued by DPW, it was not clearly erroneous for DPNR and BLUA to consider Littoral's application incomplete. Evaluation of the application on the merits does not change this.

¶75    Littoral admits it repeatedly followed up as to the status of its permit application. Therefore, it appears that DPNR, not receiving any further information from Littoral after communicating the lack of receipt of the supplemental information in August of 2017, concluded Littoral was not providing anything further and, therefore, evaluated the information that had been provided.

¶76    Considering the information before DPNR, the information not provided by Littoral, and the information obtained during DPNR's inspection and evaluation, many of the factual findings are supported by the record. Further, the few clearly erroneous factual findings do not change the

---

[174] 2021 VI SUPER 28U ("On February 28, 2020, Defendants determined that Plaintiff's minor permit was insufficient, and Plaintiff would instead need to apply for a major permit.").

[175] *In re the Matter of Q.G.*, 60 V.I. 654, 661 (V.I. 2014) ("[T]he decision of a single Superior Court judge . . . is not binding precedent on other Superior Court judges." (citing *Threadgill v. Armstrong World Indus.*, 928 F.2d 1366, 1371 & n.7 (3d Cir. 1991))).

2025 VI Super 13

analysis in a way that contradicts DPNR's factual and legal conclusions. As such, DPNR's basis for denial of the CZM permit were not clearly erroneous and were legally correct.

¶77    As a starting point, the Court considers the substantive CZM and Zoning policies as well as the procedures for enforcing those policies that have been adopted by the Legislature.

### 1. CZM and Zoning Law

¶78    Littoral challenges DPNR's interpretation and application of the CZM and Zoning laws (*i.e.*, statutes and rules & regulations). These challenges require this Court to consider the regulatory frameworks of both Virgin Islands zoning and coastal zone management. Of note, the Parcel is within tier 1[176] of the coastal zone and is zoned W-1. Therefore, in addition to the general polices and goals of the CZM Act being applicable to the Coastal Zone,[177] specific polices, goals, and objectives apply to this development, which abuts the "shoreline."[178]

#### a.  *CZM Policies, Goals, Standards and Other Zoning Requirements*

¶79    As is relevant to Littoral's application and denial, "the basic goals of the United States Virgin Islands for its coastal zone are to":

(1) "protect, maintain, [and] preserve . . . the overall quality of the environment . . ., the natural and man-made resources . . ., and the scenic and historic resources of the coastal zone for the benefit of residents . . . and visitors of the United States Virgin Islands";[179]

(2) "where feasible, enhance and restore, the overall quality of the environment . . ., the natural and man-made resources . . ., and the scenic and historic resources of the coastal zone for the benefit of residents . . . and visitors of the United States Virgin Islands."[180] "'Feasible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social and technological factors";[181]

---

[176] 12 V.I.C. § 902(r) ("'First tier' means that area extending landward from the outer limit of the territorial sea, including all offshore islands and cays, to distances inland as specified in the maps incorporated by reference in section 908, subsection (a) of this chapter."); *cf.* 12 V.I.C. § 902(y) ("'Second tier' means the interior portions of the Islands of St. Thomas, St. John and St. Croix, including all watersheds and adjacent land areas not included in the first tier.").

[177] 12 V.I.C. § 902(g) ("'Coastal zone' means all land and water areas of the Territory of the United States Virgin Islands extending to the outer limits of the territorial sea, specified on the maps identified in section 908, subsection (a) of this chapter, and is composed of two parts, a first tier and a second tier.").

[178] 12 V.I.C. § 902(z) ("'Shorelines' means the area along the coastline of the United States Virgin Islands from the seaward line of low tide, running inland a distance of fifty feet, or to the extreme seaward boundary of natural vegetation which spreads continuously inland, or to a natural barrier, whichever is the shortest distance. Whenever the shore is extended into the sea by or as a result of filling, dredging or other man-made alteration activities, the landward boundary of the shorelines shall remain at the line previously established.").

[179] 12 V.I.C. § 903(d)(1).

[180] 12 V.I.C. § 903(d)(1).

[181] 12 V.I.C. § 902(p).

2025 VI Super 13

(3) "promote economic development and growth in the coastal zone . . . by managing: (1) the impacts of human activity and (2) the use and development of renewable and nonrenewable resources so as to maintain and enhance the long-term productivity of the coastal environment"[182];

(4) "consider the need for development of greater than territorial concern by managing: (1) the impacts of human activity and (2) the use and development of renewable and nonrenewable resources so as to maintain and enhance the long-term productivity of the coastal environment";[183]

(5) "assure priority for coastal-dependent development over other development in the coastal zone by reserving areas suitable for commercial uses including hotels and related facilities, industrial uses including port and marine facilities, and recreation uses";[184]

(6) "assure the orderly [and] balanced utilization and conservation of the resources of the coastal zone, taking into account the social and economic needs of the residents of the United States Virgin Islands";[185]

(7) "preserve what has been a tradition and protect what has become a right of the public by insuring that the public . . . continue[s] to have the right to use and enjoy the shorelines and to maximize public access to and along the shorelines . . .";[186]

(8) "promote and provide affordable and diverse public recreational opportunities in the coastal zone for all residents of the United States Virgin Islands through . . . development . . . of areas consistent with sound resource conservation principles";[187]

(9) "conserve ecologically significant resource areas for their contribution to marine productivity and value as wildlife habitats, and preserve the function and integrity of reefs, marine meadows, salt ponds, mangroves and other significant natural areas";[188] and

(10) "maintain or increase coastal water quality through control of erosion, sedimentation, runoff, siltation and sewage discharge."[189]

---

[182] 12 V.I.C. § 803(d)(2).
[183] 12 V.I.C. § 803(d)(2).
[184] 12 V.I.C. § 803(d)(3).
[185] 12 V.I.C. § 803(d)(4).
[186] 12 V.I.C. § 903(b)(6). Public access to shorelines must be "consistent with constitutionally-protected rights of private property owners." 12 V.I.C. § 903(b)(6).
[187] 12 V.I.C. § 903(b)(7).
[188] 12 V.I.C. § 903(b)(8).
[189] 12 V.I.C. § 903(b)(9).

2025 VI Super 13

¶80　Because Littoral's Parcel is in the first tier of the coastal zone, further policies and objectives also govern and must be interpreted (and applied) in such a manner as to ensure they are "[c]onsistent with the basic goals set forth in section 903(b)" of title 12 of the Virgin Islands Code.[190] "[E]xcept as . . . otherwise . . . specifically provided in [chapter 21 of title 12 of the Virgin Islands Code]," the following policies "apply to all proposed developments . . . [;] and no such development [can be] approved [if it] is inconsistent with such goals and policies."[191]

¶81　The CZM Act must be interpreted and applied in such a way as:

(1) "to guide new development to the maximum extent feasible into locations with, contiguous with, or in close proximity to existing developed sites and into areas with adequate public services";[192]

(2) "to allow well-planned, self-sufficient development in other suitable areas where it will have no significant adverse effects, individually or cumulative, on coastal zone resources";[193]

(3) "to give highest priority to water dependent uses, particularly in those areas suitable for . . . recreation";[194]

(4) "to discourage uses which are neither water-dependent, water-related[,] nor have special siting needs in areas suitable for the highest . . . priority uses";[195]

(5) "to assure that all new subdivisions . . . are physically suitable for the proposed sites and are designed and improved so as to avoid causing environmental damage or problems of public health";[196]

(6) "to assure that development will be [situated] and designed to protect views to and along the sea and scenic coastal areas";[197]

(7) "to assure that development will be [situated] and designed . . . to minimize the alteration of natural land forms";[198]

(8) "to assure that development will be [situated] and designed . . . to be visually compatible with the character of surrounding areas";[199]

(9) "to the extent feasible, discourage further growth and development in flood-prone areas and assure that development in these areas is so designed as to minimize risks to life and property";[200]

---

[190] 12 V.I.C. § 906; *see also* 12 V.I.C. § 906(a) ("Development policies in the first tier shall be as follows . . . .").

[191] 12 V.I.C. § 906.

[192] 12 V.I.C. § 906(a)(1); 12 V.I.C. § 902(p) (defining feasible).

[193] 12 V.I.C. § 906(a)(1).

[194] 12 V.I.C. § 906(a)(2).

[195] 12 V.I.C. § 906(a)(2).

[196] 12 V.I.C. § 906(a)(4).

[197] 12 V.I.C. § 906(a)(6).

[198] 12 V.I.C. § 906(a)(6).

[199] 12 V.I.C. § 906(a)(6).

[200] 12 V.I.C. § 906(a)(9); 12 V.I.C. § 902(p).(defining feasible).

2025 VI Super 13

¶82    In addition to the foregoing policies guiding development, also applicable to Littoral's proposed construction are the following "[e]nvironmental policies [applicable only] in the first tier" of the coastal zone:

(1) "to conserve significant natural areas for their contributions to marine productivity and value as habitats for endangered species and other wildlife";[201]

(2) "to protect complexes of marine resource systems of unique productivity, including reefs, marine meadows, salt ponds, mangroves and other natural systems";[202]

(3) to "assure that activities in or adjacent to such complexes are designed and carried out so as to minimize adverse effects on marine productivity, habitat value, storm buffering capabilities, and water quality of the entire complex";[203]

(4) "to consider use impacts on marine life and adjacent and related coastal environment";[204]

(5) "to assure that siting criteria, performance standards, and activity regulations are stringently enforced . . . to reflect advances in related technology and knowledge of adverse effects on marine productivity and public health";[205]

(6) "to assure that development . . . adjacent to environmentally-sensitive habitat areas, especially those of endangered species, significant natural areas, and parks and recreations areas, is sited and designed to prevent impacts [that] would significantly degrade such areas";[206] and

(7) "development must be designed so that adverse impacts on marine productivity, habitat value, storm buffering capabilities,' and water quality are minimized to the greatest feasible extent by careful integration of construction with the site."[207]

To assure development meets the policies and objectives of the CZM act, "[s]ignificant erosion, sediment transport, land settlement [,] or environmental degradation of the site [must] be identified in the environmental assessment report prepared for . . . the review of the development . . . ."[208]

¶83    The following "Amenity policies [apply] in the first tier . . .":

(1) "to protect . . . public coastal recreational uses, areas[,] and facilities";[209]

(2) "where feasible or appropriate, enhance and increase public coastal recreational uses, areas[,] and facilities";[210]

(3) "to protect and enhance the characteristics of those coastal areas [that] are most valued by the public as amenities and which are scarce . . . ";[211]

---

[201] 12 V.I.C. § 906(b)(1).
[202] 12 V.I.C. § 906(b)(2).
[203] 12 V.I.C. § 906(b)(2).
[204] 12 V.I.C. § 906(b)(3).
[205] 12 V.I.C. § 906(b)(4).
[206] 12 V.I.C. § 906(b)(9).
[207] 12 V.I.C. § 906(b)(10); 12 V.I.C. § 902(p) (defining feasible).
[208] 12 V.I.C. § 906(b)(10).
[209] 12 V.I.C. § 906(c)(1).
[210] 12 V.I.C. § 906(c)(1); 12 V.I.C. § 902(p).(defining feasible).
[211] 12 V.I.C. § 906(c)(2).

2025 VI Super 13

(4) "to protect and enhance the characteristics of those coastal areas [that] . . . would be significantly altered in character by development, or . . .would cause significant environmental degradation if developed";[212]

(5) "to protect and enhance the characteristics of those coastal areas [that] . . . would cause significant environmental degradation if developed";[213]

(6) "to incorporate visual concern into the early stages of the planning and design of facilities proposed by siting in the coastal zone";[214]

(7) "to the extent feasible, maintain or expand visual access to the coastline and coastal waters";[215]

(8) "to foster, protect, improve, and ensure optimum access to, and recreational opportunities at, the shoreline for all the people consistent with public rights, constitutionally-protected rights of private property owners, and the need to protect natural resources from overuse"[216];

(9) "to ensure that development will not interfere with the public's right of access to the sea where acquired through customary use, legislative authorization[,] or dedication, including without limitation the use of beaches to the landward extent of the shoreline."[217]

¶84    To further these substantive policies, the Legislature has provided a specific permit application process that seeks to ensure DPNR issues permits in compliance with the law.

### b.  CZM Permit application process and requirements

¶85    "[A]ny person wishing to . . . undertake any development in the first tier of the coastal zone, [must] obtain a coastal zone permit in addition to obtaining any other permit required by law from any public agency prior to performing or undertaking any development."[218] "Development" includes installation of an OSDS.[219] However, "[n]o OSDS shall be constructed within the 10-year flood plain," and "[s]pecial mitigation measures are required for areas between the 10-year . . . and the 100-year level flood height."[220]

¶86    "Upon submission of any application for a coastal zone permit [to DPNR], which application shall specify the type of permit being sought, the Commissioner [must] determine whether [the submitted] application is complete."[221] In order to be complete, an application must "contain, such information, statements, drawings, maps[,] and supplementary data as are reasonably required to determine whether the project applied for complies with the criteria of the [CZM] Act."[222]

---

[212] 12 V.I.C. § 906(c)(2).
[213] 12 V.I.C. § 906(c)(2).
[214] 12 V.I.C. § 906(c)(4).
[215] 12 V.I.C. § 906(c)(4); 12 V.I.C. § 902(p).(defining feasible).
[216] 12 V.I.C. § 906(c)(5).
[217] 12 V.I.C. § 906(c)(6).
[218] 12 V.I.C. § 910(a)(1).
[219] 12 V.I.R.&R. § 910-1(e).
[220] 12 V.I.R&R. 9§ 10-1(e)(2)(b).
[221] 12 V.I.C. § 910(d)(1).
[222] 12 V.I.R.&R. § 910-3(d).

2025 VI Super 13

¶87    Factors used by DPNR to determine whether an application is complete include:

(1) Whether the application contains all documents, data, drawings[,] and other materials specified in the application form;

(2) Whether the application contains sufficient information to enable [DPNR] to evaluate the application; and

(3) Proof of adequate legal interest, including submission of all relevant legal documents . . . .[223]

To accomplish this evaluation for projects proposing an OSDS,[224] "[t]he following must be submitted to DPNR with the application:

a.  A Federal Emergency Management Agency Flood Insurance Rate Map, with the property accurately plotted;

b.  A flood plain screening [that] determine[s] whether [the] specific site is above the 10-year flood plain. . . .;

c.  Site plans and calculations must be drawn to scale, signed, dated and stamped by a V.I. Licensed Engineer or Architect, [and] include the following:

   (1) The type, size, location and elevation of the proposed system . . . clearly identified;

   (2) [A]ll property lines, buildings, wells, guts, springs, wetlands, roads, drives and water bodies [for the parcel and its immediate vicinity] clearly identified;

   (3) Ground contours at five (5) foot intervals on slopes over ten (10) percent and two (2) foot intervals on slopes under ten (10) percent. . .;

   (4) Trees with a diameter of four (4) inches or larger, large rocks, and rock outcrops . . . clearly identified;

   (5) OSDS details with cross sections, a description of the facilities served (existing and proposed)[,] and all sewerage flow calculations . . . along with the calculations for the system's liquid capacity;

   (6) The distance from at least two corners must be referenced from established control points, i.e., property corners, existing structures, trees or markers, etc., that are in the field and must be shown on the plans;

   (7) An elevation reference point [that] establish[ed] the elevation of the system's structures and pipes. The reference point must be clearly indicated on the plans, must be established and clearly marked in the field outside of the proposed construction and must be accurate to within two (2) inches;

   (8) Setback distances from property lines, water supply, water bodies, and all existing and proposed structures . . . drawn to scale."[225]

---

[223] 12 V.I.R&R § 910-7(a)(1)-(3).

[224] 12 V.I.R&R § 910-1(e)(2)(c).

[225] 12 V.I.R&R § 910-1(2)(a)-(c); 12 V.I.R. § 910-1(e)(2)(c)(8) ("Minimum setback distances for treatment tanks and in-ground disposal areas are described in Table 1. Minimum setback distances for wetland cells must be consistent with the current Virgin Islands Zoning Code setback requirements for structures. See Zoning and Subdivision Law, V.I. Code Annot. tit. 29 §§ 221 et seq.").

2025 VI Super 13

¶88    "If the Commissioner determines that such application is not complete, he shall promptly notify . . . the applicant of the deficiencies in such application."[226]  "[I]n no event [is the Commissioner authorized to take] more than 15 days after receipt" of the application to inform the applicant that the application is deficient and how the application is deficient.[227]

¶89    When the Commissioner determines that an application for a CZM minor permit is complete, the Commissioner must "promptly give written notice of the filing of [the] application to any person who requests [in writing] such notification . . . .  In addition, the Commissioner [must] give [the same written] notice to any person who [the Commissioner] determines would be affected by or [is] interested in [the] development."[228]  If any of the foregoing people request a copy of the application, "the Commissioner [must] transmit a copy of the application and [must also] request comments thereon within thirty days thereafter."[229]

¶90    "[T]he Commissioner [must] act upon a [completed] minor coastal zone permit application within sixty days after receipt thereof."; and "[a] copy of the decision of . . . the Commissioner . . .on an application . . . [must] be transmitted in writing to the applicant . . . ."[230]  "Failure of the . . . Commissioner to act within any time limit specified in . . . paragraph [910(d)(4)] constitute[s] . . . an approval of [the] application.[231]

¶91    "Any development approved pursuant to this chapter, [must] be commenced, performed[,] and completed in compliance with the provisions of the permits for such development granted or issued . . . ."[232]  "Any coastal zone permit that is issued [is] subject to terms and conditions imposed by the . . . Commissioner . . . in order to ensure that such development will be in accordance with the provisions of this chapter."[233]  "A [CZM Minor] permit [must] be granted[234] for a development if the . . . Commissioner . . . finds that[:]

(A) the development is consistent with the basic goals, policies[,] and standards provided in sections 903 and 906 of this chapter . . . ;

(B) the development as finally proposed incorporates to the maximum extent feasible mitigation measures to substantially lessen or eliminate any and all adverse environmental

---

[226] 12 V.I.C. § 910(d)(1).

[227] 12 V.I.C. § 910(d)(1).  While DPNR is authorized to promulgate Rules and Regulations in furtherance of the CZM Act, it is not free to effectively amend this provision through the promulgation process. As such, 12 V.I.C. § 910-7(a), which creates a "fifteen (15) working day" deadline, is invalid as applied to an application submitted pursuant to section 910 of title 12 of the Virgin Islands Code, which the Legislature expressly chose to state in "days" without qualification.

[228] 12 V.I.C. § 910(d)(3).

[229] 12 V.I.C. § 910(d)(3).

[230] 12 V.I.C. § 910(d)(4).

[231] 12 V.I.C. § 910(d)(4).

[232] 12 V.I.C. § 910(d)(7).

[233] 12 V.I.C. § 910(a)(3).

[234] Conversely, if an application fails to meet these requirements, it must be denied.

2025 VI Super 13

impacts of the development . . . ; and

(C) the applicant has presented certification from the Bureau of Internal Revenue and Department of Finance that the applicant has filed and paid all taxes, penalties[,] and interest and from the Office of the Lieutenant Governor that the applicant has filed its required annual report . . . ."[235]

In order to ensure a development meets "the basic goals, policies[,] and standards" of the CZM Act and "incorporates to the maximum extent feasible mitigation measures," "in the case of a minor coastal zone permit," the Commissioner is empowered to require "more restrictive" measures than "any of the development provisions in section 299 of Title 29, chapter 3, of this Code."[236] "The applicant [bears] the burden of proof to demonstrate compliance with these requirements."[237] "[O]otherwise[,] the permit application [must] be denied."[238]

¶92    "Any development . . . approved by a coastal zone permit [must] be commenced within twelve months from the date [the] permit is issued[; and f]ailure to commence . . . construction within such period [will] cause the permit to lapse and render it null and void unless an extension is granted by the . . . Commissioner."[239]

### 2. Application of Law to Fact

¶93    The Court begins by reiterating the factors[240] used by DPNR to evaluate an application:

(1) Whether the application contains all documents, data, drawings[,] and other materials specified in the application form;
(2) Whether the application contains sufficient information to enable [DPNR] to evaluate the application; and
(3) Proof of adequate legal interest, including submission of all relevant legal documents . . . .[241]

To accomplish this evaluation for projects proposing an OSDS,[242] "[t]he following must be submitted to DPNR with the application:

---

[235] 12 V.I.C. § 910(a)(2); 12 V.I.C. § 902(p).(defining feasible).

[236] 12 V.I.C. § 910(a)(3); 12 V.I.C. § 902(p).(defining feasible).

[237] 12 V.I.C. § 910(a)(2).

[238] 12 V.I.C. § 910(a)(2).

[239] 12 V.I.C. § 910(d)(7).

[240] Fundamentally, the information required for a complete application is the same information needed to properly evaluate any application. The absence of complete information greatly increases the likelihood that an application will be negatively evaluated and denied. Therefore, a logical starting point for any evaluation is the required application contents.

[241] 12 V.I.R&R § 910-7(a)(1)-(3).

[242] 12 V.I.R&R § 910-1(e)(2)(c).

2025 VI Super 13

    d. A Federal Emergency Management Agency Flood Insurance Rate Map, with the property accurately plotted;

    e. A flood plain screening [that] determine[s] whether [the] specific site is above the 10-year flood plain. . . .;

    f. Site plans and calculations must be drawn to scale, signed, dated and stamped by a V.I. Licensed Engineer or Architect, [and] include the following:

    (9) The type, size, location and elevation of the proposed system . . . clearly identified;

    (10) [A]ll property lines, buildings, wells, guts, springs, wetlands, roads, drives and water bodies [for the parcel and its immediate vicinity] clearly identified;

    (11) Ground contours at five (5) foot intervals on slopes over ten (10) percent and two (2) foot intervals on slopes under ten (10) percent. . .;

    (12) Trees with a diameter of four (4) inches or larger, large rocks, and rock outcrops . . . clearly identified;

    (13) OSDS details with cross sections, a description of the facilities served (existing and proposed)[,] and all sewerage flow calculations . . . along with the calculations for the system's liquid capacity;

    (14) The distance from at least two corners must be referenced from established control points, i.e., property corners, existing structures, trees or markers, etc., that are in the field and must be shown on the plans.

    (15) An elevation reference point [that] establish[ed] the elevation of the system's structures and pipes. The reference point must be clearly indicated on the plans, must be established and clearly marked in the field outside of the proposed construction and must be accurate to within two (2) inches.

    (16) Setback distances from property lines, water supply, water bodies, and all existing and proposed structures . . . drawn to scale."[243]

Keeping these factors in mind while considering the statutory provisions specifically factually applicable, the Court will review DPNR's bases for denial.

    *a. The proposed dwelling would be unable to conform with the 20-foot rear yard and 25-foot front yard setback requirements for residential dwellings for W-1 zoned parcels as required by 29 VIC § 229.*

¶94    As this Parcel is zoned W-1, there is a mandatory 25-foot set-back from the front property line—in effect, it is legally prohibited to construct anything within 25 feet of property line abutting the public road.[244] Additionally, in the W-1 zoning designation, if a parcel is either: (1) "adjacent" to a residential structure or (2) "adjacent" to property with a zoning designation that allows

---

[243] 12 V.I.R&R § 910-1(2)(a)-(c); 12 V.I.R. § 910-1(e)(2)(c)(8) ("Minimum setback distances for treatment tanks and in-ground disposal areas are described in Table 1. Minimum setback distances for wetland cells must be consistent with the current Virgin Islands Zoning Code setback requirements for structures. See Zoning and Subdivision Law, V.I. Code Annot. tit. 29 §§ 221 et seq.").

[244] 29 V.I.C. § 229(o) ("Front yard: Every structure in a W-1 District shall be set back from the front property line a minimum distance of twenty-five (25) feet.").

2025 VI Super 13

residential construction, then there is a minimum rear-yard set-back of 20 feet from the rear property line.[245] Given that the Parcel is located at the bottom of a significant watershed and serves as the outlet of the runoff from that watershed, it should also be noted that, according to 29 V.I.C. § 226(p), guts and drainage channels are essential for maintaining the health and general welfare of the people of the Virgin Islands; and any encroachment upon, filling, or destruction of these guts or drainage channels is a violation of subchapter I or chapter 23 of title 12 of the Virgin Islands Code unless approved by DPNR. Thus, construction over a water gut or drainage channel is generally prohibited.[246]

¶95     Factually, there is a complete lack of evidence that Littoral's Parcel is "adjacent" to property with a zoning designation that allows residential construction; and the record demonstrates that no residence neighbors this Parcel. However, it is the **applicant's burden** to establish the factual basis to support any conclusion that the minimum set-back of twenty feet from the rear property line does not apply. The plain text of 29 V.I.C. § 229 limits the rear yard setback to only parcels adjacent to a constructed residence or adjacent to property legally authorized for residential construction. Because it is the applicant's burden to establish that such a setback does not apply, DPNR's determination was not clearly erroneous in the absence of evidence that the neighboring parcels are not zoned for residential use. Given the absence of information in the record before DPNR, the conclusion that the proposed development cannot comply with the mandatory setbacks and other construction limitations[247] was reasonable and not an improper application of law.

>    ### b. Staff's site investigation showed that the natural line of vegetation used to establish the boundary of the shoreline goes beyond just 20 feet as depicted on the submitted site plan; and construction would occur within the "shoreline," as statutorily defined, which is prohibited in 12 VIC § 403.

¶96     There is evidence that the vegetation line meanders, sometimes coming 50 feet from the mean low-tide line. DPNR made its own independent measurements. Further, the building plans included in the record indicate that the survey relied upon by Littoral is from 2012. While it is questionable whether a 2012 survey could be relied upon to support an application in 2017, DPNR's own measurements are a factually and legally adequate basis for denial of the permit.

¶97     While Littoral argues that DPNR is erroneously relying on the findings of its own inspectors, there is no statutory requirement (either cited by Littoral or that the Court could independently identify) that DPNR employ a surveyor for purposes of evaluating a CZM permit application. Rather, DPNR is tasked with enforcing the CZM Act through the permitting process.

---

[245] 29 V.I.C. § (o) ("Rear yard: Every structure in a W-1 District adjoining a residential structure or property zoned for residential purposes shall provide a minimum rear yard of at least twenty (20) feet.").
[246] 29 V.I.C. § 226.
[247] This analysis would obviously change if, upon submission of a new application, it was factually true that the rear-yard set-back does not apply.

2025 VI Super 13

Had the Legislature wished to establish specific qualifications for DPNR's inspectors under the CZM Act, it readily could have written such language into the CZM Act. It did not.[248]

¶98     While DPNR's findings are not determinative of a future CZM permit application, given that storms and water erosion change coastlines over time, a more recent survey than one conducted in 2012 was surely needed, even in 2017. For this and the reasons explained, DPNR's factual basis for denial was not clearly erroneous; and the legal basis for denial was not incorrect.

### c. Due to the foregoing defects in the proposed construction, the proposed development was found to be inconsistent with 12 V.I.C. § 906(a)(10).

¶99     Paragraph 906(a)(10) mandates that construction in the first tier of the coastal zone must comply with all other applicable laws. As the zoning requirements are other laws applicable to construction within the coastal zone, DPNR's conclusion that the failure to meet the setback requirements and comply with the shoreline setback were legally correct, even if the rear setback does not apply. The shoreline measurements taken by the DPNR inspector indicate that the construction will not comply with either the CZM Act or the zoning setback or both. Further, section 226 of title 29 of the Virgin Islands Code prohibits construction that would block a watershed or drainage gut; and the information before DPNR did not address this.

¶100     As this is a question of application of law to fact, this Court's review is plenary.[249] DPNR's conclusion based on the information (or perhaps more accurately the lack of information) was correct. It is the applicant's burden to provide information sufficient for DPNR to conclude that the CZM Act and all other applicable laws are satisfied, and Littoral failed to meet its burden.

### d. The parcel is a Flood Prone Area, as indicated by: (1) the flora and fauna present at the site indicating periodically standing water, (2) the Flood Zone waters from the adjacent property designed to be diverted onto the parcel, and (3) the site is along the shoreline and susceptible to storm surges and heavy wave action. Therefore, the proposed construction is not compatible with 12 V.I.C. § 906(a)(9).

---

[248] Importantly, if the Court were to agree with Littoral's argument, such a ruling would, in effect, impose a requirement on DPNR to hire licensed surveyors for enforcement purposes. Such a ruling would be judicially legislating a requirement not imposed by the Legislature and violate the separation of powers doctrine embodied in the Revised Organic Act. *See generally Bryan v. Fawkes*, 61 V.I. 201, 212 (2014) ("The Revised Organic Act "divides the power to govern the territory between a legislative branch, an executive branch, and a judicial branch," reflecting that "Congress 'implicitly incorporated the principle of separation of powers into the law of the territory.'" (quoting *Kendall v. Russell*, 572 F.3d 126, 135 (3d Cir. 2009))); *Bryan v. Virgin Islands WAPA*, 77 V.I. 196, 215 (V.I. Super. 2023) ("The Revised Organic Act of 1954 applies the separation of powers doctrine to the Virgin Islands, dividing the powers of the Government into three co-equal branches, the Executive, Legislative, and Judicial branches." (citing *Balboni v. Ranger Am. of the V.I., Inc.*, 70 V.I. 1048, 1084 (V.I. 2019))).

[249] V.I.R. Civ. P. 91.

2025 VI Super 13

¶101    Factually, the record does not reflect that plants and animals indicate standing water on Littoral's Parcel. Rather, it indicates that the neighboring parcel has periodic standing water. As such, this factual finding is clearly erroneous.

¶102    However, the Parcel sits at the base of a very large watershed; and the outlet to the ocean is over Littoral's Parcel. Likewise, the Parcel is along the shoreline. Both findings are supported by the record and support the conclusion that the Parcel is in a flood prone area.

¶103    Paragraph 906(a)(9) requires "to the extent feasible" that construction in flood-prone areas be discouraged and that any construction in such areas minimize risk to life and property. The Parcel is only 50 feet inland with the proposed construction only five-six feet above mean sea level and situated at the bottom of a large watershed, which runoff discharges over Littoral's Parcel. DPNR was correct to require any construction proposal address "to the extent feasible" all concerns relating to flooding, including wastewater and sewage disposal.

¶104    Nothing in Littoral's application addressed DPNR's concerns that Littoral's sewage system would be only two feet below the surface of the ground in a flood prone area subject to storm surges and significant run-off and did not address how sea water would not seep into the OSDS. Further, Littoral did not address the difference between the other residence further inland and its location on the shore, as was its burden.

¶105    As the factual record indicates, DPNR informed Littoral that its email supplement was never received; and the administrative record does not contain any evidence to indicate Littoral ever provided the supplement a second time. As such, DPNR's concerns about storm surges and management of run off from the watershed that drains over Littoral's Parcel were never addressed. DPNR's conclusions in this regard are neither factually clearly erroneous nor legally incorrect.

> e. *Littoral proposes the construction of a three-story residence under 50 feet inland from the shoreline and adjacent to 1,500 foot-long white sandy beach used by residents and visitors. The only development along the beach area is a pavilion and restroom facility. As such, DPNR concluded this would alter the natural land form too greatly, block the sea view, and generally be incompatible with the area.*

¶106    The provisions of 12 VIC § 906(a)(6) require the development to be properly sited to protect views to and along the sea, to minimize the alteration of the natural landform, and to be visually compatible with the character of the surrounding area.

¶107    Factually, DPNR's description of the location is accurate but incomplete. What is stated is correct, but DPNR leaves out that there is a restaurant and watersports business in this area. While not sharing a parcel border with Littoral's Parcel, this tourist attraction is only diagonal across the public road. The area of the restaurant and water sports shop also appears to be located on the parcel that has periodic standing water, which hosts mangroves. The building plans show a three-

2025 VI Super 13

story construction. While DPNR's omission of any reference to the restaurant and watersports business is rather glaring, the facts recited by DPNR support the conclusion that the construction would block the view of the sea and greatly change the balance of vegetation along the shore side of the road adjacent to the beach.

¶108   Certainly a three-story house in place of the existing forested area would dramatically change the appearance at that end of the beach; and nothing in Littoral's application indicates how it would include planting of native vegetation that would shield the construction from view on either the beach or the road. Further, the restaurant and watersports rental facility are not on the beach but across the road. Considering these facts, the conclusion that the proposed construction would change the natural landform and be visually incompatible with the area is supported by the record

> *f.   Onsite sewage disposal system (OSDS) may be located within the 10-year floodplain, and special mitigation measures are required for areas between the 10-year and 100-year level flood height. A flood plain screening was necessary for this location. In addition, the effluent from the OSDS has the potential to enter the sea causing negative effects on water quality within the bay. An OSDS is prohibited within the 10-year flood plain. 12 VIR & R § 910-1(e)(2)(b). As such, DPNR concluded that the proposed construction is inconsistent with 12 VIC § 906(b)(9) and 906(b)(10).*

¶109   There is no question that, if not in the ten-year flood plain, the Parcel is between that and the 100-year flood plain. Thus, special mitigation measures are necessary to avoid the OSDS being overwhelmed during major flood and storm events. DPNR's concern that nothing in the record addresses erosion control seems particularly valid because the proposed system would be only two feet below the surface. Moreover, nothing in the record addresses the fact that sea water is only two feet below the surface and would leech into the OSDS. DPNR's concerns about the water table and proximity to the ocean and to Maho Bay were all reasonable and unaddressed. Indeed, the building plans show the OSDS being located adjacent to the beach (as opposed to on the side of the Parcel furthest away).

¶110   The conclusion that further information is needed and that the present proposal did not adequately protect against adverse environmental impacts to the beach and marine habitat were founded. Paragraphs 906(b)(9)-(10) require such measures to protect the environment, especially in such close proximity to the beach.

2025 VI Super 13

**Accordingly, it is hereby**

**ORDERED** that BLUA's Decision is **AFFIRMED**; and it is further

**ORDERED** that a copy of this Memorandum Opinion and Order shall be directed to counsel of record, BLUA, and the Commissioner of DPRN.

Dated: June 27, 2025

HONORABLE SIGRID M. TEJO
Judge of the Superior Court

**ATTEST:**

**TAMARA CHARLES**
Clerk of the Court

BY:

for **DONNA D. DONOVAN**
Court Clerk Supervisor 7 / 1 / 2025